No. 84-543

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

STATE OF MONTANA,

        Plaintiff and Respondent,

-vs-

COURTNEY BROOKE ATLAS,

        Defendant and Appellant.

APPEAL FROM: District Court of the First Judicial District,
In and for the County of Lewis & Clark,
The Honorable Gordon Bennett, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Jackson Law Firm; Gregory Jackson argued, Helena, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
James M. Scheier argued, Asst. Atty. General, Helena
Mike McGrath, County Attorney, Helena, Montana

Submitted: October 9, 1986

Decided: November 18, 1986

Filed: NOV 1 8 1986

_Ethel m. Harrison_
             Clerk

Mr. Chief Justice J. A. Turnage delivered the Opinion of the Court.

Defendant Atlas appeals from a jury conviction of deliberate homicide and arson in the First Judicial District Court, Lewis and Clark County. On August 10, 1985, Atlas was designated a dangerous offender and sentenced to 120 years imprisonment with no parole.

We affirm.

Defendant Atlas raises six issues for our review:

1. Did substantial evidence support the verdicts of guilty?

2. Does the destruction of potentially exculpatory evidence by the State require reversal of Atlas' conviction?

3. Did the District Court err when it allowed testimony of a crematorium operator about the effects of cremation on the human body?

4. Did the District Court err when it allowed video-taped testimony by Atlas' former lover about Atlas' extramarital affair?

5. Did the District Court err when it sustained the State's objection to Atlas' cross-examination of the coroner about motive and bias?

6. Did the District Court err when it refused Atlas' Instruction No. 10, which stated that an unexplained fire is presumed to be accidental?

Defendant Atlas was 41 years old and resided in the Helena valley with his wife, Donna, and their son, Brian, and daughter, Michelle. Defendant filed for bankruptcy in early 1983. Atlas was the beneficiary of casualty homeowners' insurance and Donna's life insurance, totaling approximately $250,000.

At 5:18 a.m. on Sunday, July 17, 1983, firefighters and sheriff's officers responded to a fire at the Atlas residence. The house burned to the ground. At 7:45 a.m. on July 17, firefighters discovered the charred remains of Donna Atlas in the living room.

Two days prior to the fire, Donna and Michelle had traveled to Donna's parents' ranch near Wisdom, Montana. Donna planned to stay through the weekend and leave Michelle for the remainder of the summer. Defendant Atlas remained in Helena. Brian was at a Lions' Camp near Elliston, Montana. Donna planned to pick up Brian on her return trip to Helena on Sunday, July 17.

However, Donna received a phone call from defendant on Saturday afternoon, July 16. Donna appeared upset after the call. She immediately returned to Helena, alone and one day early. Her burned body was found sixteen hours later.

Defendant contends that the evidence against him is circumstantial and not sufficient to support a conviction. We will discuss the evidence in detail in the course of this opinion. However, we note that defendant's statements about the events of Saturday night and Sunday morning are riddled with contradictions. Saturday evening, while Donna waited outside in Atlas' truck, defendant told an acquaintance that he had just picked Donna up at the hospital and that she had terminal cancer. Donna did not have cancer. Defendant told investigators that Donna had a sore back, yet also testified that Donna helped him slide a large couch through an upstairs opening, then helped him carry it around the house and into the downstairs. Defendant told investigators that Donna started a fire in the basement stove because the night was cool, yet testified that he shifted bedrooms because the

3

night was so hot. Defendant changed his story several times about which bedroom he used on Saturday night.

Upon noticing the fire, defendant testified that he crawled through thick, choking smoke. However, no witness saw any ash on him, heard him cough from the smoke's effect, or smelled any smoke on defendant's clothing. The jury did not accept several of defendant's explanations: why he did not break the locked sliding glass door to the living room and help Donna; why he did not unlock the sliding glass door with the spare key kept next to the door; or why he did not enter through a second door, located on the same floor and on the same side of the house.

Throughout the investigation and trial, defendant Atlas' statements varied in major details and conflicted with other witness' testimony. These variances and defendant's explanations were fully presented to the jury for its consideration as the fact-finding body.

Issue No. 1

Did substantial evidence support the verdicts of guilty?

The substantial evidence test is whether a reasonable person would accept the conclusion, when viewed in the light most favorable to the prevailing party. State v. Wilson (Mont. 1981), 631 P.2d 1273, 1278, 38 St.Rep. 1040, 1047. The evidence in defendant's trial was primarily circumstantial, there being no witnesses to the homicidal act or the arson. If circumstances are capable of two interpretations, the trier of fact determines which is the most reasonable.

A careful review of the trial transcript convinces us that the evidence fully supports the defendant's conviction

4

of deliberate homicide. The State's two pathologists and defendant's pathologist testified to the severe thermal damage to Donna's body, which was found on the burned remains of the stuffed couch. The State's pathologist testified that such damage is unusual without the use of accelerants. He indicated an accelerant may have been applied to the body because 90 percent of the body was completely charred. Both parties' experts agreed that Donna's airway had no soot or thermal damage. Furthermore, Donna's blood and tissue had less than 10 percent carbon monoxide. The State's pathologists concluded that the lack of soot in the windpipe and minimal carbon monoxide indicated that Donna was dead before the fire began. The thiocyanate level in Donna's tissue was compatible with the pathologists' conclusions, because her body was exposed to the heat, the falling debris, and the firefighters' water. In addition, she was found lying face up with limbs spread, while most fire victims are found face down in a fetal position. The State's pathologists also testified that the pulmonary edema in Donna's lungs could have resulted from strangulation and that her throat may have been cut out.

Defendant's fire expert based much of his opinion on interviews with the defendant. The expert did not personally examine any tissue, did not interview any firefighters, and did not consult any fire investigators. Yet, he concluded that Donna was alive during the fire. The jury may appropriately attach less weight to his testimony.

In summary, the evidence of deliberate homicide is substantial and supports defendant's conviction. "This [substantial evidence] test is met if a reasonable mind would accept the evidence as supporting the conclusion reached. . .

If the evidence conflicts, it is within the province of the trier of fact to determine which shall prevail." State v. Oman (Mont. 1985), 707 P.2d 1117, 1120, 42 St.Rep. 1565, 1568.

On the issue of arson, the deputy state fire marshal secured the area where Donna's body was found, which was also the area of origin of the fire. For several days, he hand-sifted through the debris. The state fire marshal also inspected the fire scene. Both fire marshals eliminated the heating pad under Donna, the wood stove in the living room, any electrical short, and acts of God as causes of the fire. They concluded that arson caused the fire.

The fire marshals based their arson conclusion on several facts. The intense heat far exceeded the temperature of a normal house fire, as indicated by the destruction of Donna's limbs and facial bones. The complete consumption of the carpet indicated that the floor temperature in the living room reached at least 790°F., while a typical house fire has floor temperatures below 250°F. The one-hour fire wall between floors burned through in much less than one hour. The burn patterns along the baseboards and the even burn in the living room indicated the use of an accelerant. Defendant's own expert admitted that the "alligator patterns" on the charred wood were compatible with the use of flammable liquids.

In summary, the evidence supports the defendant's conviction for arson. "The United States Supreme Court and this Court have both stated that a conviction cannot be overturned when the evidence, viewed in the light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a

reasonable doubt."  State v. Doney (Mont. 1981), 636 P.2d 1377, 1383, 38 St.Rep. 1707, 1713.

Although circumstantial, the evidence is abundant and fully supports the defendant's convictions of both deliberate homicide and arson.


Issue No. 2

Does the destruction of potentially exculpatory evidence by the State require reversal of defendant's conviction?

Defendant contends that the materials in the living room were shoveled three or four times and then dumped outside the building.  He asserts that the materials directly under the body were discarded without laboratory testing, and that the couch, the carpet, and the mopboards were not secured.  Defendant further contends that the condition of the scene prevented his expert from examining the evidence and thus robbed defendant of his right to present a complete defense.

However, Deputy Fire Marshal Houston carefully preserved any burned material with evidentiary value, while removing non-evidentiary material from the fire site.  The fire marshal hand-sifted the evidentiary debris with a garden trowel.  The baseboard remnants were preserved in an evidence locker, along with the electrical wiring.  The carpet-backing found beneath Donna's body tested free of accelerants and was carefully set to the side.  The front-end loader, which was used to clean up the fire scene, never entered the living room area and never disrupted the evidentiary material.  The State showed great care and diligence in preserving all relevant evidence.  The debris removed by the loader was

irrelevant and nonexculpatory. Furthermore, all the evidentiary material was available at all times for inspection by defendant's fire expert. We note that the fire expert based his opinion primarily on interviews with defendant, and prior to examining any physical evidence.

Defendant claims that the piled debris was exculpatory, yet offers no factual basis for its potential exculpatory use. "In order to amount to denial of due process, negligently suppressed evidence must be vital to the defense of the accused. . . To obtain a new trial, the accused must show more than suppression; he must show the evidence was material and of some substantial use to him." State v. Craig (1976), 169 Mont. 150, 153, 545 P.2d 649, 651. Defendant Atlas has shown neither negligent destruction nor vital material use. On the contrary, the State has shown diligent preservation of all relevant evidence. We find no merit in this issue raised by defendant.

Issue No. 3

Did the District Court err when it allowed testimony of a crematorium operator about the effects of cremation on the human body?

Before trial, defendant moved for an in limine prohibition of the operator's testimony on the grounds of inflammatory prejudice and incompetence. He asserted that prejudicial testimony is admissible only if it accurately depicts conditions as they existed, and if it is useful to explain the evidence. Defendant further contended that the operator had no personal knowledge of Donna's remains.

At trial, defendant argued that the thermal damage to Donna's body was more closely related to house fires than to

8

crematoriums. Defendant produced two pathologists, who testified that they had seen thermal damage similar to Donna's in other house fires. Defendant concluded that the slight relevance of the operator's testimony was outweighed by its gruesome prejudice.

The trial court questioned the State about the relevance of the operator's testimony. The State responded that the probative value of the testimony was supported by the operator's estimates of the time and high temperature necessary for the near-cremation of Donna's body. This testimony corroborated the fire marshal's estimates of the time and high temperature of the Atlas fire, thereby indicating accelerants and arson. The operator's testimony also supported the testimony of State's pathologists on the intense heat necessary to char Donna's bones. The operator's testimony was brief and clinical. Furthermore, the operator's testimony on cremation was a far less prejudicial alternative than the photographs of Donna's limb-less corpse.

The question of whether the probative value of evidence is outweighed by potential prejudice must be determined in the trial court's discretion. A District Court's weighing of potential prejudice against probative value will be upheld where there is no abuse of discretion. State v. Pease, Jr. (Mont. 1986), 724 P.2d 153, 161, 43 St.Rep. 1417, 1427. "We will not demand that a trial be sanitized to the point that important, probative evidence must be excluded." State v. Austad (1982), 197 Mont. 70, 83, 641 P.2d 1373, 1380. In summary, we find no abuse of discretion in the trial court's allowing the operator's testimony.

Issue No. 4

Did the District Court err when it allowed videotaped testimony by defendant's former lover about defendant's extramarital affair?

In his opening statement, defense counsel portrayed Courtney Atlas as a loving husband frozen by grief. "At that time [of the fire] Mr. Atlas was basically so totally grief stricken that he was just unfunctionable and he wandered around crying and whatnot and waiting for the fire department and police to come as he watched everything he owned and the woman he loved burn in the fire."

Prior to the videotaped testimony, defense counsel cross-examined several witnesses about Atlas' affection toward Donna. He asked one of Donna's co-workers: "Okay. So as far as seeing that there was a lack of emotional display in the presence of other people, you couldn't say whether it was Courtney's disposition or Donna's disposition, could you?" He later asked another co-worker: "So as far as seeing any, you know, real close affection flowing back and forth between Courtney and Mrs. Atlas, that wouldn't have been unusual for Donna, would it, not to have been kissing or hugging in public?"

The videotaped testimony was made by defendant's former lover, Diana Olson. On appeal, defendant contends that Olson's testimony was character evidence which had not been drawn into issue by defendant during trial, and was therefore inadmissible under Rule 404(a), Mont.R.Evid. The State, however, used Olson's videotaped testimony as probative evidence to refute defendant's opening assertions and cross-examinations. Thus, defendant himself opened the door on the relevancy of Atlas as a loving husband.

Furthermore, during the videotaped cross-examination of Olson, defense counsel attempted to minimize the impact of the affair on Atlas' marriage:

> Q. And during the time that there was involvement between the two of you, there has never been any commitment by Courtney that he was going to leave Donna--
>
> A. No.
>
> Q. -- for that relationship.
>
> A. No.

After Olson's testimony, defense counsel continued his theme of defendant as a loving husband. On direct examination of defendant, he asked:

> Q. How would you describe your relationship with Donna then over the years?
>
> A. I think as an average pretty good, because of our similar interests. I would call it a good -- we, I think, had ups and downs like anybody, but we had a pretty good, pretty good relationship . . .
>
> Q. And did you love Donna?
>
> A. Yes, very much.

Throughout defendant's portrayal of himself as a loving husband, and the State's rebuttal of that portrayal, the trial court properly assessed relevancy. "The District Court has broad discretion to determine whether or not the evidence is relevant. Without a showing that the District Court has abused its discretion, this Court will not overturn the District Court's determination of relevancy." State v. Oman, 707 P.2d at 1119-1120, 42 St.Rep. at 1568.

The testimony about defendant's relationship with Olson was also relevant to defendant's homicidal motive. We have previously held that the testimony of a defendant's ex-lover was admissible when, "evidence of defendant's past intimacies

was highly relevant to the defendant's claim that he killed [his wife] in the heat of passion upon learning of her affair . . ." State v. Doll (Mont. 1985), 692 P.2d 473, 478, 42 St.Rep. 40, 47.

Defendant Atlas further contends that the videotaped testimony concerned an affair which was too remote in time. Defendant asserted that the affair's physical relationship had ended seven months prior to the fire. However, the remoteness in time goes to weight and not to admissibility. Even the remoteness was questionable, because Olson testified that, although the physical relationship had ended seven months earlier, defendant continued to visit her house "just as friend to friend."

In summary, Olson's testimony was relevant to rebuttal and motive. We find that the trial court did not abuse its discretion in allowing the videotaped testimony about defendant's extra-marital affair.

Issue No. 5

Did the District Court err when it sustained the State's objection to defendant's cross-examination of the coroner about motive and bias?

On State's direct examination, the coroner testified: "It is the worst, worst body that I have ever viewed." On cross-examination, Atlas' counsel asked: "You don't like Mr. Atlas?" The coroner responded: "Definitely not." The State immediately objected. Defendant contends that he was improperly cut short of his impeaching inquiry into the coroner's credibility and hostile feelings.

The court did not abuse its discretion by sustaining the State's objection. Defendant's cross-examination about

12

the coroner's bias went beyond the scope of the State's direct examination. The cross-examination was also irrelevant because it had no bearing on the condition of Donna's body.

Furthermore, the sustained objection did not prevent defendant from pursuing a related line of inquiry. "The latitude of cross-examination is in the discretion of the trial court, and this Court will not interfere unless it is manifest that the trial court abused its discretion." State v. Gallaher & Coleman (1978), 177 Mont. 150, 159, 580 P.2d 930, 935. Also, if defendant thought that the objection cut him short, defendant could have called the coroner during his case-in-chief.

Defendant Atlas suffered no prejudice as a result of the court's ruling, because the coroner answered before the State could interpose an objection. If, arguendo, the sustained objection was in error, it did not impair a substantial right because the jury heard the answer.

In either case, defendant failed to make any timely offer of proof about his cross-examination, in accordance with Rule 103(a), Mont.R.Evid. He raised the issue for the first time on appeal. As we have previously held: "This Court will not review a matter raised for the first time on appeal." State v. Transgrud (1982), 200 Mont. 303, 308, 651 P.2d 37, 40.

Issue No. 6

Did the District Court err when it refused defendant's Instruction No. 10, which stated that an unexplained fire is presumed to be accidental?

Defendant Atlas' proposed Instruction No. 10 read: "You are instructed that, ordinarily, it will be presumed that an unexplained fire was caused by an accident or natural causes or, at least, that it was not of criminal origin." Defendant cited C.J.S. and Am.Jur.2d, which collectively implied that an unexplained fire is presumed to be accidental. Defendant claimed that the burden is on the State to overcome such a presumption, and that he was entitled to a specific instruction on that point.

The instruction was properly refused because it incorrectly states the law. The instruction language is an out-of-context summation of a larger discussion of arson in 6A C.J.S. §§ 38 and 39. The full discussion reveals that the statement only applies when no suspicious facts accompany the fire. At the Atlas fire, investigators found a plastic jug containing gasoline, several aerosol cans with holes punched in the bottoms, massive thermal destruction, and burn patterns indicating arson. Any presumption of a non-criminal fire is rebuttable by such evidence of criminal design. State v. Collins (Or. Ct. App. 1973), 511 P.2d 440, 442. Therefore, the instruction was properly denied.

In conclusion, we note the exemplary conduct of the trial judge during a long and complicated trial. In addition, all trial counsel held to the highest standards of zealous advocacy. The issues raised by defendant, taken singly or as a whole, are not substantial enough to overturn defendant's conviction.

The jury verdicts are affirmed.

Chief Justice

14

We concur:

_John Conway Harrison_

_____

_____

_Frank B. Morrison_

_L. C. Gulbrandson_

_William E. Hunt_
Justices

15

Mr. Justice John C. Sheehy, concurring in the result:

The court committed two errors in this cause, the unduly limited restriction on the cross-examination of the coroner, and two, the admission of testimony about an extra-marital affair.

The latter is the most serious. There is no rational basis to assume without question that a man indulging in extra-marital sex does not really love his wife. The prejudicial effect of such testimony outweighed any probative effect the evidence had, and should have been excluded.

The remaining evidence against the defendant is so weighty that I would regard these two errors as not significant. Therefore, I concur in the result.

John C. Sheehy
_____
Justice
