No. 97-243

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 20

STATE OF MONTANA,

Plaintiff and Respondent,

v.

CHARLES HOWELL,

Defendant and Appellant.

FILED

FEB 09 1998

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Second Judicial District,
               In and for the County of Silver Bow,
               The Honorable James E. Purcell, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

            Deirdre Caughlan, Attorney at Law, Butte, Montana

        For Respondent:

            Hon. Joseph P. Mazurek, Attorney General; Cregg Coughlin,
            Assistant Attorney General, Helena, Montana

            Robert M. McCarthy, County Attorney;
            Samm Cox Deputy, County Attorney, Butte, Montana

                              Submitted on Briefs: January 15, 1998

                              Decided:  February 9, 1998

Filed:

_____
                 Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1    Appellant Charles Howell (Howell) was convicted of attempted deliberate homicide and appeals from the Second Judicial District Court's findings of fact, conclusions of law, judgment and order. We affirm.

¶2    We address the following issues on appeal:

¶3    1. Did the District Court err in refusing to instruct the jury on the offense of attempted mitigated deliberate homicide?

¶4    2. Did the District Court err in refusing to instruct the jury on the offenses of aggravated and felony assault?

Factual and Procedural Background

¶5    On April 1, 1996, Howell and his roommate, Gary Cargle (Cargle) were at their residence in Butte, Montana. At about 5:30 p.m., Jim Oliver (Oliver) and his girlfriend Amanda Stanwood (Stanwood) stopped by to visit Howell. Oliver and Stanwood had been drinking at several casinos earlier that afternoon and brought a gallon jug of wine and some beer with them to Howell's. Howell, Cargle, Oliver, and Stanwood proceeded to drink and socialize for several hours.

¶6    Later in the evening, Howell went into the kitchen and began fixing dinner. Howell testified that after putting some chicken in the oven, he went upstairs and got in the shower.

2

In the meantime, Cargle, Oliver, and Stanwood became involved in a conversation about religion. At this point, the parties' versions of events differ.

¶7    Stanwood and Oliver testified that Cargle became upset at a comment that Stanwood made about religion, walked over to Stanwood, and punched her in the mouth. Cargle was unavailable at trial, but his tape-recorded statement was admitted into evidence. Cargle stated that it was Oliver, not he, who punched Stanwood. Cargle claimed that Oliver began pushing Stanwood and that he tried to get between Oliver and Stanwood. All parties agree that Oliver jumped on top of Cargle and began hitting him.

¶8    Howell testified that while he was in the shower, he heard Cargle screaming for help. He opened the shower door, put on a pair of cut-offs, and ran down to the living room. He stated that he found Oliver on top of Cargle, "beating the hell out of him." Cargle is a disabled veteran and does not have full use of one of his arms. Howell testified that he saw Oliver beating Cargle and was afraid that Cargle had no way to defend himself. Howell testified that he tried to shove Oliver off of Cargle, but that Cargle knocked him against the wall.

¶9    Howell testified at trial that he then went into the kitchen and grabbed a knife. He admitted that he returned to the living room with the knife and came up behind Oliver. Howell testified at trial, "I put the knife to his throat and told him to get off." However, later in his testimony, Howell stated that Oliver had attacked him and that he fell to the floor with

3

Oliver on top of him. He stated that he had the knife in his hand and when he pulled his arm away, Oliver may have been cut.

¶10 Stanwood testified at trial that Howell was sitting in the living room at the time the altercation began. She stated that after Oliver and Cargle began fighting, Howell came up behind Oliver with a knife. She stated that Howell pulled Oliver's head back and cut him ear to ear. Stanwood grabbed Oliver, put her hand over his throat, and drove him to the emergency room.

¶11 At the emergency room, Oliver was treated by Dr. Richard Gould. Dr. Gould testified that Oliver had lacerations on his hand and fingers. The laceration on Oliver's neck extended from ear to ear through the layers of skin, fat, and muscle. The cut was of uniform depth and came within one millimeter of Oliver's carotid artery and jugular vein. The cut on Oliver's neck had to be stapled closed.

¶12 After receiving a report of the altercation, two police officers were dispatched to Howell's residence. They noticed blood on the sidewalk outside of the house and on the front door. After the officers knocked on the door several times, Howell answered. Inside, the officers found blood on the walls and door and a large pool of blood on the living room floor. Cargle had blood on his shirt, pants, and shoes. Howell did not have any blood on him.

¶13 In the kitchen, an officer found a large kitchen knife on the counter, which was later found to have blood on it consistent with Oliver's. There were no signs that food was being prepared. In the bathroom the officers noticed blood on the toilet bowl and sink and a bucket

4

of ammonia water and rags on the floor. The officers also testified that when they arrived, there was a load of laundry in the washing machine.

¶14 Howell told the officers that Oliver and Stanwood had gotten into an argument and that he had asked them to leave. When questioned further, Howell stated that Oliver had assaulted Cargle and that he had tried to push Oliver off of Cargle. Howell told the officers that he was not sure whether Oliver had been cut, but that he thought Stanwood may have cut Oliver.

¶15 Howell was charged by information with attempted deliberate homicide in violation of §§ 45-4-103(1) and 45-5-102(1)(a), MCA. Prior to trial, the District Court granted Howell's motion for a psychological examination. Howell was examined by Dr. Bernard Peters, who testified at trial. Dr. Peters testified that Howell suffers from depressive disorder, but that no signs or symptoms of the depressive disorder appeared to be manifest at the time of the crime. Dr. Peters concluded that Howell's consumption of alcohol was the main factor in the incident.

¶16 A jury found Howell guilty, and he was sentenced to 25 years, plus 2 years, suspended, for the use of a weapon. He appeals from this judgment.

## Standard of Review

¶17 A criminal defendant is entitled to have the jury instructed on each issue or theory that is supported in the evidence. State v. Gopher (1981), 194 Mont. 227, 229, 633 P.2d 1195, 1196. This Court reviews jury instructions in criminal cases to determine whether the

instructions as a whole fairly instruct the jury on the law applicable to the case. State v. Brandon (1994), 264 Mont. 231, 870 P.2d 734.

## Discussion

¶18    1. Did the District Court err in refusing to instruct the jury on the offense of attempted mitigated deliberate homicide?

¶19    Under Montana law, a criminal defendant "may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense necessarily included in the offense charged." Section 46-16-607(1), MCA. The defendant is entitled to a jury instruction on a lesser included offense when one of the parties requests it and when the record contains evidence from which the jury could rationally find the defendant guilty of the lesser offense and acquit of the greater. Section 46-16-607(2), MCA; State v. Castle (Mont. 1997), 948 P.2d 688, 54 St.Rep. 1194.

¶20    A person commits the offense of deliberate homicide if he or she "purposely or knowingly causes the death of another human being." Section 45-5-102(1), MCA. The defendant is guilty of mitigated deliberate homicide when he or she "purposely or knowingly causes the death of another human being but does so under the influence of extreme mental or emotional stress for which there is reasonable explanation or excuse." Section 45-5-103(1), MCA. Thus, mitigated deliberate homicide is not a lesser included offense of deliberate homicide in the traditional sense, but rather is an affirmative defense that must be proven by the defendant by a preponderance of the evidence. Section 45-5-103(2), MCA; see State v. Goulet (Mont. 1997), 938 P.2d 1330, 54 St.Rep. 482. We have held that for a

6

defendant accused of deliberate homicide to be entitled to an instruction on mitigated deliberate homicide, the defendant must put forth some evidence demonstrating that he or she acted under extreme mental or emotional stress for which there is reasonable explanation or excuse. State v. Heit (1990), 242 Mont. 488, 492, 791 P.2d 1379, 1382.

¶21 Howell argues that the District Court erred by refusing his proposed jury instruction on attempted mitigated deliberate homicide as the record contains sufficient evidence for a jury to convict him of this offense rather than of attempted deliberate homicide. Specifically, he argues that his testimony and that of Dr. Peters presented evidence that he was acting under the influence of extreme mental or emotional stress for which there was a reasonable explanation. We determine that the record is void of any such evidence.

¶22 After examining Howell, Dr. Peters testified that Howell had been hospitalized as a teen for personality disorder and aggression and that he still suffers from a depressive disorder. He testified that Howell's disorder caused him to be hypersensitive to the behavior of others and to become easily irritated and angered. However, Dr. Peters concluded that "[a]t the time of the offense it did not appear that signs or symptoms of the depressive disorder were manifest." He also noted that he found no evidence of psychotic-type thinking, hallucinations, or delusions. Dr. Peters concluded that "by using alcohol, [Howell] disinhibited his controls."

¶23 This Court has repeatedly held that simply being intoxicated or angry does not support a finding of extreme mental or emotional stress for which there is a reasonable explanation

7

or excuse. Goulet, 938 P.2d at 1332-33; State v. Williams (1993), 262 Mont. 530, 541, 866 P.2d 1099, 1106. Dr. Peters testified that while Howell does suffer from a personality disorder, his use of alcohol caused him to lose control and was the main, overriding factor in the incident.

¶24 Howell testified that he was afraid of Oliver because he knew him to be an aggressive drunk. He stated that when he saw Oliver attacking his defenseless friend, he felt he had to intervene. However, Howell's anger or fear, without more, does not support a finding of extreme mental or emotional stress for which there is a reasonable explanation or excuse. Williams, 866 P.2d at 1106. Therefore, we hold that the District Court did not err in refusing Howell's proposed instruction on attempted mitigated deliberate homicide.

¶25 2. Did the District Court err in refusing to instruct the jury on the offenses of aggravated and felony assault?

¶26 Howell argues that he was entitled to instructions on aggravated and felony assault. One commits the offense of aggravated assault "if the person purposely or knowingly causes serious bodily injury to another." Section 45-5-202(1), MCA. A person commits the offense of felony assault "if the person purposely or knowing causes bodily injury to another with a weapon." Section 45-5-202(2)(a), MCA. Assault is a lesser included offense of the crimes of deliberate homicide and attempted deliberate homicide. See State v. Sellner (Mont. 1997), ___ P.2d ___, 54 St.Rep. 1464; Castle, 948 P.2d at 691.

¶27 In Castle, the defendant was charged with deliberate homicide. The testimony at trial established that the defendant punched the victim three times in the jaw and once on the side

8

of the head, but that another man stabbed the victim several times and kicked the victim in the head. Castle, 948 P.2d at 691. The pathologist who examined the victim testified that the causes of death were stabbing and severe blunt force injuries to the head. He stated that the type of blows that caused this injury were not simple punches or even the type of punch that would normally be inflicted by a boxer. Castle, 948 P.2d at 691.

¶28 The district court refused the defendant's request for jury instructions on assault. On appeal, we held:

> Although this Court holds that assault is an included offense, that does not mean that an instruction on this offense must be given every time a defendant is charged with deliberate homicide. Rather, there must be some basis from which a jury could rationally conclude that the defendant is guilty of the lesser, but not the greater offense.

Castle, 948 P.2d at 691. We determined that the testimony and medical evidence were consistent with the defense theory that, although the defendant punched the victim, those blows only amounted to assault and did not cause his death. We held that the district court erred in not instructing the jury on assault. Castle, 948 P.2d at 692.

¶29 In contrast, there is no evidence in this case that any person other than Howell caused Oliver's injuries. Howell admitted that he came up behind Oliver and put a knife to his throat. However, Howell stated that Oliver fell on top of him and was cut accidentally when Howell pulled his arm away. Stanwood testified that she saw Howell pull Oliver's head back and slit his throat. Thus, all parties agree that Howell cut Oliver, and the only disputed issue

9

is whether the record contains any evidence that Howell intended to inflict bodily injury rather than death.

¶30 A similar challenge was raised in Sellner, 54 St.Rep. at 1464. In that case, Sellner was convicted of attempted deliberate homicide in the shooting of a police officer. Police officers went to Sellner's home to investigate a reported assault. As the police officers were driving away, they spotted Sellner riding in a vehicle and proceeded to pull that vehicle over. Sellner, 54 St.Rep. at 1464. Sellner jumped out of the vehicle and ran into the woods. An officer followed and shouted for Sellner to stop, but Sellner turned and shot the officer in the chest with a .41 caliber handgun. The officer, who was wearing a bulletproof vest, survived the shooting. Sellner, 54 St.Rep. at 1465.

¶31 At trial, Sellner admitted that he shot at the officer several times, aiming at the officer's chest. Sellner, 54 St.Rep. at 1466. Sellner testified that he had heard a voice telling him that the officer was wearing a vest and that if he shot him in the chest he would not hurt him. A physician testified at trial that the officer's injuries would likely have been fatal had he not been wearing the bulletproof vest. Sellner, 54 St.Rep. at 1466.

¶32 The district court refused to instruct the jury on assault, and Sellner was convicted of attempted deliberate homicide. Sellner, 54 St.Rep. at 1466. On appeal, this Court held: "From the evidence presented at trial, it would be irrational to conclude that Sellner's shooting of Parcell in the chest with a large caliber soft-point bullet was done with any intent other than to cause a person's death." Sellner, 54 St.Rep. at 1466. We determined that

Sellner's testimony, that voices had assured him the officer would not be hurt, if believed, would support an acquittal, not a conviction for assault. <u>Sellner</u>, 54 St.Rep. at 1466.

¶33 Likewise, in this case, the testimony in the record and the medical evidence do not support an instruction on aggravated or felony assault. The injuries inflicted were nearly fatal. The laceration on Oliver's neck extended through skin, fat, and muscle and was within one millimeter of Oliver's carotid artery and jugular vein. Dr. Gould testified: "You could not get [a] more uniform [cut] without trying."

¶34 The record contains no evidence that Howell intended to inflict bodily injury rather than to cause the death of Oliver. Howell admitted to threatening Oliver with a knife and testified at trial:

> I was behind him but I put the knife to his throat and told him to get off, I hadn't used the knife. Listen, I like Jim Oliver, but when you threaten, you threaten, you show him you mean it or he's going to get up and kick the shit out of me.

Howell then stated that he did not intend to injure Oliver, but cut him accidentally. This theory, if accepted, would support an acquittal, not a conviction for assault. Therefore, we hold that the District Court did not err in refusing to instruct the jury on aggravated or felony assault.

¶35 Based on the foregoing, we affirm the decision of the District Court.

_W. William Leaphart_
Justice

We concur:

_J. A. Turnage_
Chief Justice

_Terry Trieweiler_

_Karla M. Gray_

Justices