No. 02-271

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 166

STATE OF MONTANA,

    Plaintiff and Respondent,

    v.

WILLIAM L. BROWN,

    Defendant and Appellant.

APPEAL FROM:    District Court of the Third Judicial District,
                In and For the County of Deer Lodge, Cause No. DC 2001-01,
                Honorable Ted L. Mizner, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

        Edmund F. Sheehy, Jr., Cannon and Sheehy, Helena, Montana

        For Respondent:

        Honorable Mike McGrath, Attorney General; Micheal S. Wellenstein,
        Assistant Attorney General, Helena, Montana

        Mike Grayson, County Attorney, Anaconda, Montana

                                    Submitted on Briefs:  April 3, 2003

                                    Decided:  June 19, 2003

Filed:

        _____
                            Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1     Appellant, William L. Brown (Brown), appeals his conviction of deliberate homicide with the use of a deadly weapon and his corresponding sentence of 110 years. We affirm.

¶2     The issues on appeal are as follows:

¶3     1. Was there sufficient evidence to sustain the conviction of deliberate homicide, as opposed to mitigated deliberate homicide?

¶4     2. Did the District Court impose an illegal sentence by punishing Brown for exercising his constitutional right to a jury trial?

Factual and Procedural Background

¶5     Phil and Misty Nebeker and their two children lived in Anaconda. Brown lived four blocks away from the Nebekers and had known Misty since elementary school. On the evening of December 18, 2000, Brown telephoned Phil and asked Phil to buy beer with him. Phil left the house to buy beer with Brown while Misty stayed home and watched videos with the children. Brown and Phil later returned to the Nebekers' house with a 20-pack and a 12-pack of beer. Misty was drinking wine coolers and Brown and Phil were drinking beer. Misty testified that Brown and Phil were drinking moderately and neither was drunk. At some point, all three went to an upstairs bedroom to smoke marijuana. Afterwards, on their way downstairs, Phil began to yell at Misty and accused her of having an affair with Brown.

¶6     Misty walked into the kitchen to get another wine cooler. Phil followed her and continued to accuse her of having an affair. Misty testified that, as she was reaching into the refrigerator for a wine cooler, Phil grabbed her by the hair, pulled her hair back, and slapped

2

her two or three times. Misty testified that Phil then kicked her legs. Misty testified that Brown was not in the kitchen when Phil kicked her. She also acknowledged that they were not within the view of Brown who was in the living room. Misty yelled at Phil to leave her alone and that he was hurting her. Misty testified that she never yelled or told Brown that her life was in danger or that she thought Phil was going to kill her. Misty was afraid that Phil was going to hurt her, but not kill her. Misty testified that Brown came into the kitchen and told Phil not to hit her. She testified that when Brown walked into the kitchen Phil was still holding onto her hair, but that Phil let go of her when Brown entered the kitchen.

¶7    Brown and Phil began to argue. Misty left the kitchen and went into the living room, where she covered the children up with blankets and sat on the couch. Misty did not call 911 because she did not believe the fight would escalate to a homicide. From the living room, Misty could not see what was happening in the kitchen. She could hear Brown and Phil arguing but could not understand what they were saying. She heard a thud and the voices stopped. Brown came into the living room holding a broken kitchen knife. Brown had blood on him and said: "I stabbed him. I think he's dead." Brown told Misty that he thought Phil was going for a knife; he pushed Phil out of the way, and grabbed the knife. Misty told Brown that they needed to call an ambulance and the police; Brown responded that he had to think. Misty testified that she did not call an ambulance because she was scared and could not move. She stated that Brown kept repeating that he needed to think. Brown also kept repeating that Phil was going to kill her. Brown told her that he had saved her life.

3

¶8     Misty estimated that Brown killed Phil some time after 1:00 a.m. Mike Brown, testified that around 1:00 or 1:15 a.m. he received a telephone call from his brother, Bill Brown. Brown asked Mike to come to the Nebekers' house. Mike got dressed and walked the four blocks to the Nebekers' house. After Mike arrived, Brown told him that he had killed Phil. Mike thought he was joking. Mike described Misty as shaking, nervous, and in shock. Brown took Mike to the back bedroom to show him Phil's body. Brown told Mike that Phil was being a "dick" to Misty. Mike however did not recall anyone saying that Phil had been hitting Misty. Brown told Mike that he got into a pushing match with Phil in the kitchen and stabbed him. Mike stated that Brown was pacing the floor trying to figure out what to do. Mike also observed that his brother was not totally upset about what had happened. Mike testified that Brown wanted to get rid of Phil's body. Brown asked Mike to help him move the body and talked about not having a truck available. Mike testified he did not want to help his brother move the body. After ten to fifteen minutes at the Nebekers' house, Mike left.

¶9     On the morning of December 19, 2000, Misty's brother, Dan Hansen was leaving his grandmother's house when Brown came up to him and asked for a ride to a friend's house. Hansen gave Brown a ride. Hansen testified that Brown seemed fine and that he was not crying, upset, or emotional. When Hansen and Brown arrived at the friend's house, Misty was sitting on the couch and crying. Misty told her brother that Brown had killed Phil last night. Misty explained how it happened. She said that when she was in the kitchen getting something out of the refrigerator, Phil grabbed her by the hair. Misty then said that Brown

4

came into the kitchen and she ran into the living room as Brown and Phil started to fight. Misty told her brother she was in the living room when the stabbing occurred. When Misty described the homicide that morning, Hansen testified that Misty did not tell him that Phil had slapped or kicked her. Hansen told Brown and Misty that he "didn't want any part of this," and if they did not call the police, he would.

¶10 Later in the afternoon, Brown and Misty returned to the Nebekers' house. At 3:15 p.m., Brown called the police and asked the police dispatcher to send a detective to the Nebekers' residence. When the dispatcher asked Brown what was going on, Brown responded that there was a "dead guy in the bedroom." After further questioning by the dispatcher, Brown revealed that the dead man was Phil Nebeker. Detective Sullivan was in the dispatch room when Brown called. He described Brown as very calm during the call and not speaking with any great deal of emotion.

¶11 Police officers Jack Kelly and Mike Fink were the first to arrive at the Nebekers' house. When the officers entered the house, Brown was smoking a cigarette in the living room. When Officer Kelly asked him what was going on, he failed to answer. After Officer Kelly asked him a second time, Brown pointed toward the kitchen area and said he was back there. Officer Kelly followed a blood trail to a pile of bed sheets and clothing lying on the floor where Phil's body was. Officer Fink, meanwhile, was with Misty and Brown in the living room. Officer Fink asked them what was going on and neither of them answered. He then directly asked Brown, and Brown said: "I stabbed the f---er." Brown also told Officer Fink that the stabbing had occurred last night. Officer Fink placed both Misty and Brown

5

under arrest. Detective Sullivan testified that when Officer Fink arrested Brown, Brown's emotional state was cold. He was not upset or crying. Officer Fink testified that, in the past, he has been around Brown when he has been drinking and that Brown has been aggressive towards him. Hansen, Misty's brother, also testified that he has seen Brown get really angry when he drinks.

¶12 The police took photographs of Misty and had her examined by a physician because of her report that Phil had pulled her hair, slapped her face, and kicked her legs. Detective Sullivan testified that Misty had marks on her neck from a previous surgery but there were no recent marks on her face. He saw no bruises or lacerations on her face. The photographs of Misty's legs showed no marks or bruises. Misty acknowledged that there were no bruises in photographs taken of her at the police station. Dr. David Kidder examined Misty on the evening of December 19, 2000. In his work as an emergency room doctor, Dr. Kidder routinely deals with people who have been victims of assault. Dr. Kidder testified that he saw no visual evidence that Misty had been physically assaulted.

¶13 The police also took photographs of Brown to document any of his injuries. Detective Sullivan testified the photographs depicted some old scars on his back. Aside from those scars, there were basically only three marks on Brown's body. There was a small mark or scratch on the back of Brown's neck just below his hairline. There was a small cut on Brown's right hand above his wrist. Detective Sullivan testified that an assailant can incur "knife slippage" marks if he loses control of the knife and gets caught by the blade. He stated that the mark on Brown's hand could have been a "knife slippage" mark from when

6

the knife handle broke off. Detective Sullivan testified that usually clothing gets ripped or stretched when there has been a wrestling match of some sort during a fight and that the shirt Brown was wearing did not appear to be stretched, ripped or damaged in any kind of struggle.

¶14 State Medical Examiner, Dr. Gary Dale, performed an autopsy on Phil. Dr. Dale testified that Phil had a knife wound that went all the way through his left hand. Dr. Dale also testified that Phil had a stab wound on the back of his left forearm consistent with a defensive-type wound. Phil also had a bruise on his right bicep. Dr. Dale testified that when there has been a reported fight, he sometimes finds bruising over the victim's knuckles. Dr. Dale saw no bruising, scrapes, or abrasions over Phil's knuckles. Dr. Dale acknowledged that for there to be bruising, Phil would have had to hit another object with sufficient force to tear blood vessels. Dr. Dale found no injuries that were not directly related to the stab wounds, except for a small scrape on Phil's left wrist, which was probably related to the knife. Phil had three stab wounds to his chest, one of which fatally sliced a chamber of his heart.

¶15 State Crime Lab Forensic Toxicologist James Hutchinson testified that he found no marijuana in Phil's blood, but that both Brown's and Misty's drug screen tests revealed the inactive metabolite of marijuana. A month after killing Phil, Brown sent a letter to Hansen, Misty's brother. In the letter, Brown stated in part: "[Y]ou know what's sad is I don't feel all that bad when I killed him[.] [I]t's like I have know feelings about it you know!"

¶16 On January 3, 2001, the State charged Brown with deliberate homicide for killing Phil Nebeker. Prior to the trial, the State and Brown were unsuccessful in negotiating a plea agreement.

¶17 At trial, the District Court instructed the jury on the offense of deliberate homicide and the affirmative defense of mitigated deliberate homicide. Brown argued to the jury that it should convict him of mitigated deliberate homicide. The jury found him guilty of deliberate homicide and the District Court sentenced Brown to 100 years in prison for deliberate homicide and an additional consecutive ten years for his use of a weapon during the homicide.

## Discussion

## I

¶18 Was there sufficient evidence to sustain the conviction of deliberate homicide, as opposed to mitigated deliberate homicide?

¶19 We have held that a conviction cannot be overturned when the evidence, viewed in the light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *See State v. Atlas* (1986), 224 Mont. 92, 97, 728 P.2d 421, 424. We conclude that the evidence presented at trial was sufficient to allow a jury to convict Brown of deliberate homicide.

¶20 At trial, Brown argued the affirmative defense of mitigating circumstances. In Montana, a defendant commits the offense of deliberate homicide when he or she "purposely or knowingly causes the death of another human being." Section 45-5-102(l)(a), MCA. A

8

defendant commits the offense of mitigated deliberate homicide when he or she "purposely or knowingly causes the death of another human being but does so under the influence of extreme mental or emotional stress for which there is a reasonable explanation or excuse." Section 45-5-103(1), MCA (emphasis added). This Court has held that extreme mental or emotional stress for which there is a reasonable explanation or excuse cannot be based on a defendant's intoxication or anger. *State v. Howell*, 1998 MT 20, ¶ 24, 287 Mont. 268, ¶ 24, 954 P.2d 1102, ¶ 24; *State v. Goulet* (1997), 283 Mont. 38, 42, 938 P.2d 1330, 1332-33. Mitigated deliberate homicide is an affirmative defense which the defendant bears the burden of proving by a preponderance of the evidence. Section 45-5-103(2), MCA. Whether a defendant is acting under the influence of extreme mental or emotional stress is a question of fact for the jury. *State v. Azure*, 2002 MT 22, ¶ 49, 308 Mont. 201, ¶ 49, 41 P.3d 899, ¶ 49.

¶21 Brown argues that the jury should have convicted him of mitigated deliberate homicide because he was under the influence of extreme mental or emotional stress when he stabbed Phil. He claims that his extreme mental or emotional stress was due to Phil's accusations of an affair, the subsequent fight between Phil and Brown, and his close relationship with Misty. Brown also claims that the State failed to present any evidence to refute his contention that he was acting under extreme mental or emotional stress and, therefore, the jury should have found him guilty of mitigated deliberate homicide.

¶22 The State responds that it did present sufficient testimony that Brown was not acting under "extreme mental or emotional stress for which there is a reasonable explanation or

excuse" when he killed Phil. The State points out that, apart from Brown's own self-serving statements, there was no evidence of a physical fight between Brown and Phil. First, Detective Sullivan testified that during a fight, clothes are usually stretched or ripped, and that Brown's were not. Also, apart from a knife slippage mark, there was no physical evidence that Brown had been injured. There were no bruises, scrapes or abrasions on Phil's knuckles to indicate that there had been a fight between the two men.

¶23 Secondly, the location of the blood also refutes Brown's claim that Phil had attempted to grab a knife in the kitchen and that Brown stabbed him in the kitchen after beating Phil to the knife. Phil's body, the large pool of blood, and the blood spattering, were all in the bedroom. In fact, the only traces of blood in the kitchen were some bloody footprints. The location of the blood indicates that the stabbing did not occur in the kitchen, but that Brown had stabbed Phil after Phil had retreated to the bedroom.

¶24 Finally, a number of witnesses testified that Brown was seemingly calm about the murder. Dan Hansen testified that the day after the murder Brown seemed fine; he was not emotional or upset. Detective Sullivan, who was in the dispatch room when Brown called the police, testified that Brown was very calm and unemotional during the call. Officer Fink, who, with Officer Kelly, was the first to arrive at the Nebeker house, testified that Brown's emotional state was cold. Later, in a letter to Dan Hansen, Brown wrote that he didn't feel "all that bad when [he] killed him."

¶25 This evidence belies Brown's contention that he was under the influence of extreme mental or emotional stress for which there is a reasonable explanation or excuse. We hold

10

that the testimony and evidence presented at trial, when viewed in the light most favorable to the prosecution, would allow a rational trier of fact, in this case a twelve-member jury, to find the essential elements of deliberate homicide beyond a reasonable doubt.

II

¶26    Did the District Court impose an illegal sentence by punishing Brown for exercising his constitutional right to a jury trial?

¶27    Brown alleges that the District Court punished him for exercising his constitutional right to a trial by imposing a sentence twice as long as the one allegedly offered by the State during plea negotiations.  Brown requests that this Court reverse his sentence and remand the matter to the District Court for re-sentencing in accordance with the terms of the proposed plea agreement.  After ordering and reviewing a Presentence Investigation of Brown, the District Court sentenced him to 100 years on the deliberate homicide charge and 10 years for the use of a dangerous weapon.  According to Brown, the State had offered him a sentence of 50 years for the deliberate homicide charge and 10 years for the use of a dangerous weapon in exchange for his guilty plea.  The State maintains, as it did at Brown's sentencing hearing, that it offered him a 75-year sentence, not a 50-year sentence, in exchange for his guilty plea.  Except for being apprised of the plea negotiations at a pretrial conference, there is no evidence that the District Court was involved in the plea negotiation process.

¶28    District courts have broad discretion in sentencing defendants convicted of criminal offenses.  *State v. Smith* (1996), 276 Mont. 434, 445, 916 P.2d 773, 780.  We generally

review a criminal sentence only for legality–that is, to determine whether it is within the statutory parameters established by the legislature; where a sentence is within those parameters, we generally will affirm. *Smith*, 276 Mont. at 445, 916 P.2d at 780 (citing *State v. Almanza* (1987), 229 Mont. 383, 386, 746 P.2d 1089, 1091). There are, however, exceptions to these general rules.

¶29    In *State v. Baldwin* (1981), 192 Mont. 521, 525, 629 P.2d 222, 225, this Court established that punishing a person for exercising a constitutional right is a basic due process violation. In *Baldwin*, the District Court, following its review of the defendant's preliminary presentence investigation, offered him a 45-day jail term in exchange for his guilty plea on charges of aggravated assault. The defendant rejected the judge's proposed plea agreement, the case proceeded to trial, and the defendant was convicted. However, second time around, the same judge sentenced the defendant to ten years in prison. The defendant appealed his sentence contending that the District Court had punished him for exercising his right to trial. *Baldwin,* 192 Mont. at 525, 629 P.2d at 224. We ruled that a trial court, which involves itself in an unsuccessful plea bargaining process and, thereafter, imposes a harsher sentence than was offered in exchange for a guilty plea, must expressly point out the factors which justify the increased sentence. *Baldwin,* 192 Mont. at 527-28, 629 P.2d at 226. Because the trial court in *Baldwin* had not done so, we concluded that there was no assurance that the sentence was not increased in retaliation for the defendant's insistence on a jury trial; on that basis, we remanded for re-sentencing. *Baldwin,* 192 Mont. at 528, 629 P.2d at 226.

12

¶30    We followed *Baldwin* and remanded for re-sentencing on substantially similar facts in *State v. Tate* (1982), 196 Mont. 248, 639 P.2d 1149.   In *Tate*, the District Court offered the defendant a five-year sentence immediately prior to trial if he pled guilty to the charge. The defendant did not accept the plea agreement, a jury convicted him, and the same judge sentenced the defendant to ten years.  In *Tate*, since we could not determine what new information or facts had led the sentencing court to dramatically increase the sentence, we remanded the case for re-sentencing. *See Tate*, 196 Mont. at 251, 639 P.2d at 1150.

¶31    The facts in the case at bar are clearly distinguishable from those in both *Baldwin* and *Tate*.   In both of those cases, the sentencing court was directly involved with the plea negotiation process.  Here, the District Court was not involved.  The parties merely informed the District Court at the pretrial conference that the State and Brown were attempting to negotiate a plea agreement.  No evidence suggests that the sentencing court itself offered Brown a reduced sentence in exchange for his guilty plea.

¶32    Thus, *Baldwin* and *Tate* have no application here.  Nonetheless, the District Court complied with our rulings in *Baldwin* and *Tate*, which require the sentencing court to expressly point out the factors that justify a defendant's increased sentence.  At Brown's sentencing hearing, the District Court enumerated the many factors it had considered in imposing the maximum prison sentence of 100 years for deliberate homicide, *see* § 45-5-102(2), MCA.  The court stated:

> In arriving at this sentence, the Court has considered the circumstances surrounding the offense.  The Court heard the testimony and understands that, even with the conflict between the victim and his wife in this matter, that there

13

is no excuse or justification for what happened. Nothing excuses the conduct of that--of the Defendant that happened that night. It should have easily been handled, and should have been handled, by at least a referral to law enforcement. Defendant chose to do what he did, and he did so with a mean spirit, the Court thinks. And as the Court indicates, there's been no expression of any remorse for what has happened. The Court has considered the severe impact on the victim, the families of the victim, and the tragic circumstances that have resulted. The Court has considered the Defendant's relatively young age in arriving at this sentence. I've considered his education and his family history. I've considered his lengthy criminal record, which also indicates a history of some violence. The Court has considered the Defendant's long-standing alcoholism and his long-standing substance abuse problems. I've considered the recommendations of the probation officer in this matter. I've considered the psychological evaluation which indicates that Mr. Brown has an anti-social personality disorder, which is difficult for treatment. The Court has considered the Defendant's defiance of the law. The Court considers the Defendant to be a threat to the safety of the community; and the Court considers that the Defendant's prospects for rehabilitation are very guarded, at best.

This fairly exhaustive list of the factors considered by the sentencing court sufficiently accounts for the maximum prison sentence it imposed on Brown.

¶33 Nothing in the record before us supports Brown's claim that his sentence was improperly increased because he exercised his right to a jury trial. Therefore, we hold that the sentencing court did not violate Brown's constitutional right to due process.

¶34 Affirmed.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ JIM REGNIER

14

/S/ JIM RICE