No. 03-108

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 372

STATE OF MONTANA,

        Plaintiff and Respondent,

   v.

RICHARD EARL BURKHART,

        Defendant and Appellant.


APPEAL FROM:    District Court of the Eighth Judicial District,
                        In and for the County of Cascade, Cause No. ADC-01-493-2,
                        The Honorable Thomas M. McKittrick, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

        Kristina Guest (argued), Assistant Appellant Defender, Helena, Montana

        For Respondent:

        Hon. Mike McGrath, Attorney General; Jim Wheelis (argued),
        Assistant Attorney General, Helena, Montana

        Brant Light, Cascade County Attorney; John Parker, Deputy County
        Attorney, Great Falls, Montana


                      Argued:  July 7, 2004
                  Submitted: July 13, 2004
                    Decided:  December 23, 2004

Filed:


                                   Clerk

Justice Jim Regnier delivered the Opinion of the Court.

¶1    Defendant Richard Earl Burkhart (Burkhart) was convicted by a jury in the Eighth Judicial District Court, Cascade County, on one count of deliberate homicide, felony-murder. Burkhart appeals his conviction. We affirm.

¶2    The following issues are presented on appeal:

¶3    1. Whether the District Court correctly denied Burkhart's motion to dismiss on the grounds the State's accomplice testimony was uncorroborated?

¶4    2. Whether the District Court correctly denied Burkhart's motion to dismiss and deprived him of due process on the grounds the predicate offense for felony-murder was an assault with a weapon?

¶5    3. Whether the District Court abused its discretion when it removed a prospective juror for cause?

¶6    4. Whether the District Court improperly considered Burkhart's refusal to admit guilt or express remorse at his sentencing hearing?

## PROCEDURAL AND FACTUAL BACKGROUND

¶7    On November 13, 2001, the body of William Ledeau (Ledeau) was found at 12th Street and 1 Alley North in Great Falls, Cascade County. He had been struck in the head four times with a blunt object. The State initially charged Burkhart on December 10, 2001, with deliberate homicide by accountability. The State later amended the information on September 4, 2002, to include deliberate homicide, felony-murder, pursuant to § 45-5-102(1)(b), MCA. Burkhart was found guilty as charged by a jury on September 19, 2002,

2

and sentenced to life imprisonment on October 24, 2002.

¶8    Prior to trial, the State moved to dismiss one juror for cause during *voir dire* because of the opinion he expressed concerning a reluctance to follow laws he found disagreeable. The prosecuting attorney brought up the example of seat belt laws and asked the following question of the prospective juror:

> MR. PARKER: [A]s you know, we have a law in Montana that requires people to wear seat belts. Let's pretend that you're here today as a juror in a seat belt trial. And let's also pretend that you personally don't like to wear a seat belt and that you personally don't agree with that law that requires people to wear seat belts.
>
> If a judge were to instruct you that that is the law and if the evidence showed beyond a reasonable doubt that the offense were committed, would you be able to follow the law in that situation?
> . . . .
>
> MR. O'LEARY: I would have a hard time agreeing with that. Because all laws are supposed to be based on the Constitution, and I do not see where you can force people to wear a seat belt.
>
> MR. PARKER: Okay. Well, that's an important point. Not everyone will always agree with a different law. But you do understand, Mr. O'Leary, if you were chosen as a juror, that you're actually not allowed to decide whether or not you agree with the law, that your own role would be to evaluate the facts and decide whether the offense happened.
>
> MR. O'LEARY: I might have a problem with that. If like, say, it was a blatant violation of the Bill of Rights or something, like some of the gun laws we have, you know, it says–in the Constitution it says that the right shall not be infringed upon. Yet there is (sic) all kinds of laws about guns right now that I think are unconstitutional and should be disregarded.
>
> MR. PARKER: So you're saying, in other words, that it might be difficult for you in a certain kind of a case to follow the law as the judge gives it to you if you didn't agree with it?
>
> MR. O'LEARY: Yeah, it would.

After the prosecutor challenged O'Leary for cause, the District Court allowed Burkhart's

attorney, Vincent van der Hagen, to question him. Their exchange proceeded as follows:

> MR. van der HAGEN: [I]s it any law that you would have a problem with or is it just specific laws that you would have a problem with?
>
> MR. O'LEARY: Just laws that would be, you know–no, just a few laws.
>
> MR. van der HAGEN: Just a few laws. What are those laws?
>
> MR. O'LEARY: Like I was saying, gun laws, I think a lot of them are unconstitutional.
>
> MR. van der HAGEN: Gun laws. What about the gun laws do you have a problem (sic)?
>
> MR. O'LEARY: Just the restriction that are placed on them. When it says that shall not be infringed upon, and yet there is–
>
> MR. van der HAGEN: Are you talking about a person's right to possess a gun; is that what you're talking about?
>
> MR. O'LEARY: Right.
>
> MR. van der HAGEN: Would you have a problem if an individual had used a gun to shoot someone, would you have a problem with–under the law, if you believed that the law says if this person did this, and he did it using a gun and he is guilty, guilty of the crime, would you let that person off the–
>
> MR. O'LEARY: No.
>
> MR. van der HAGEN: Find him not guilty because of the gun laws?
>
> MR. O'LEARY: No.
>
> MR. van der HAGEN: What other laws do you have a problem with, sir?
>
> MR. O'LEARY: Just some of the search and seizure laws like that–you know, people involved in drugs, you know, like I've heard of cases where people have marijuana on them or something, and they seize their whole car.

4

MR. van der HAGEN: Drug forfeiture laws. Do I understand you correctly?

MR. O'LEARY: Right. Some of those. Unless, you know, I mean–

MR. van der HAGEN: Why do you have a problem with those kind of laws?

MR. O'LEARY: Because it goes against what I believe.

Following further exchanges, the District Court stated: "Well, he has said he wouldn't follow the law if he didn't agree with it. And I think that's grounds for disqualification." The District Court then excused O'Leary and a jury was eventually impaneled.

¶9 The trial began on September 9, 2002. The State's evidence at trial showed the following: In search of the individuals behind an attempted break-in of his car, Burkhart and his friend, Michael Staley (Staley), encountered Ledeau in the alley between 1 Alley North and 12th Street. Ledeau had been walking home from his aunt's house. Burkhart and Staley confronted Ledeau, accusing him of breaking into Burkhart's car earlier that evening. When Ledeau denied his involvement in the break-in and took offense at being accused, Burkhart hit Ledeau in the head once with a ball-peen hammer. After the initial blow, Ledeau attempted to flee but was eventually caught and hit three more times in the back and top of the head by Burkhart. Burkhart and Staley then returned to Staley's house and called police to report the break-in.

¶10 Officer Jamie Pinski of the Great Falls Police Department initially arrived at the crime scene and stated she was approached by Burkhart and Staley. According to Pinski, Burkhart and Staley told her Burkhart's vehicle had been broken into and they had seen a male run northbound across Central Avenue down 12th Street North. They also saw a second male

5

run after the first male and, intending to confront the suspected thieves, gave chase after the two men. In pursuit, Burkhart and Staley said they ran through the parking lot to the east-side of "All Seasons Spas" and cut off one of the males in 1 Alley North. Burkhart and Staley told Pinski they caught and confronted one of the males.

¶11 Staley indicated the male flipped his hat off and stated, "Come on mother-fuckers, let's go" and began challenging them to a fight. Pinski reported she pointed out a baseball cap lying near Ledeau and asked them if it appeared to be the same cap the male suspect was wearing. Pinski indicated both Burkhart and Staley agreed that it was the suspect's hat. Ledeau's aunt, Joanne Dubois, testified at trial Ledeau was wearing the baseball hat when he left her home that evening.

¶12 Burkhart and Staley were further interviewed that evening by police. Detectives learned from Burkhart he had broken parole that day, traveling from Bigfork to Great Falls to visit Staley, another parolee, and buy some methamphetamine. Burkhart stated he was getting ready to drive back to Bigfork when they both walked out to his car and discovered someone had stolen some change, cigarettes, and a jacket from inside the automobile. Additionally, someone had attempted to pry open the trunk of his car in order to gain access to the speakers in the back.

¶13 Both men told officers they had confronted an Indian man in the alley but had walked away when the individual became angry and confrontational. They described the male as Native American, in his twenties, about 5' 10" with a stocky build, skinny mustache, some hair on his chin and a "skater hair cut." Burkhart indicated the male was wearing a dark

6

shirt, dark pants and a blue baseball cap. This description matched Ledeau when officers found him that evening. Burkhart and Staley also claimed to have seen other suspicious individuals in the area that evening. Although Burkhart maintained he and Staley had left the confrontation when the male became angry, he later told detectives he chased the male to within 50 feet of where Ledeau's body was found.

¶14   As part of their investigation, detectives also interviewed Staley's roommate, Rochelle Smith-Sterner. Smith-Sterner recalled on November 12, 2001, observing Burkhart and Staley leave her residence to execute a methamphetamine purchase. A short time later, she remembered hearing Burkhart yelling that someone had broken into his car, specifically "I am going to kill the fucker that broke into [my] car." Shortly thereafter, Smith-Sterner observed Burkhart and Staley running after two individuals in the area of Central Ave and 12th Street. Smith-Sterner's residence is across the street from the alley where Ledeau was found. Smith-Sterner indicated that as Burkhart and Staley caught and confronted the second male on Central Avenue, she "knew right then and there that someone was going to get their ass kicked." Smith-Sterner described the person encountered as a male about twenty-years old, about 5' 8" in height with a somewhat heavy build and a dark-complexion of Spanish or Native American heritage. Smith-Sterner also indicated the male was wearing a baseball cap. Smith-Sterner went on to state her attention was diverted by her two small children running in the street. It took approximately five to ten minutes to return her kids to the house by which time she was unable to see what had transpired between Burkhart, Staley and the individual.

¶15 Although police interviewed a number of other suspects, Burkhart and Staley remained the primary focus of their investigation. Although both men proclaimed their innocence and claimed the man in the alley they confronted was not Ledeau, officers suspected collusion when Staley and Burkhart separately assisted police sketch-artists in producing a composite sketch of the man they confronted in the alley. The sketches resembled Ledeau. When Staley was confronted with this fact, he became emotional and terminated the interview.

¶16 Fearing incarceration for accountability to deliberate homicide, Staley eventually admitted he had witnessed Burkhart assault Ledeau. At trial, Staley testified Burkhart, upon confronting Ledeau, had struck Ledeau in the right cheek with a ball-peen hammer which had been lying on the car's passenger-side fender. After Ledeau stumbled backwards, he regained composure and ran down the alley. Burkhart gave chase, eventually seizing Ledeau and leveling several blows to the top and side of Ledeau's head. Staley then testified he and Burkhart agreed to tell friends and police they had seen someone in the alley that night but had left the encounter. Staley then told Burkhart to get rid of the ball-peen hammer because it might have fingerprints. Great Falls Police later recovered the ball-peen hammer from a local resident who found it near where Ledeau had died. The ball-peen hammer in evidence carried neither fingerprints nor bloodstains.

¶17 Dr. Gary Dale, the State Medical Examiner, performed Ledeau's autopsy on November 14, 2001, and determined the cause of death to be blunt-force trauma to the head. Dr. Dale found Ledeau had been struck at least four times in the head by an unknown object.

One of the wounds had penetrated Ledeau's skull, leaving an approximate one and one quarter inch circular hole in his head. The blow tore the brain directly beneath another laceration and also bruised the brain-stem, a wound itself sufficient to kill Ledeau. There were two other tears on the back of his head consistent with a blunt instrument which penetrated the muscle at the back of the neck.

¶18 Dr. Dale also retained the two fractured portions of Ledeau's skull and used them at trial to show how the ball-peen hammer fit into the depressions. Although police had gathered other hammers through their investigation, only the ball-peen hammer found at the crime scene fit both of Ledeau's depressions precisely. The rounded bottom of one of the fractures was smooth, matching the ball-peen end, and other characteristics of the wound showed that a rounded surface the size of the ball-peen end caused the injuries. Dr. Dale concluded Ledeau was struck at least four times with an instrument, two blows on the side of his skull and two in the back, including one in the neck. Ledeau would not have been able to stumble consciously after receiving the most severe injury.

¶19 Burkhart was found guilty by the jury on September 19, 2002, for felony-murder pursuant to § 45-5-102(1)(b), MCA. On October 24, 2002, the District Court sentenced Burkhart to life in prison. Burkhart appeals. We affirm.

## ISSUE ONE

¶20 **Whether the District Court correctly denied Burkhart's motion to dismiss on the grounds the State's accomplice testimony was uncorroborated?**

¶21 On appeal, Burkhart argues Staley's accomplice testimony must be corroborated by

independent evidence connecting Burkhart with Ledeau's murder. Burkhart asserts the eyewitness testimony and forensic evidence presented by the State failed to corroborate Staley's testimony, proving only suspicion and not justifying a conviction.

¶22   In response, the State argues its corroborating evidence was sufficient to prove the circumstances of the crime's commission. The State maintains the forensic evidence matching Ledeau's wounds to the murder weapon and verified accounts of Burkhart's demeanor and activities adequately corroborate Staley's testimony.

¶23   The denial of a motion to dismiss in a criminal case is a conclusion of law. *State v. Dixon*, 2000 MT 82, ¶ 10, 299 Mont. 165, ¶ 10, 998 P.2d 544, ¶ 10. The sufficiency of evidence to corroborate the testimony of an accomplice is a question of law which we review to determine whether it was correct. *State v. Fey*, 2000 MT 211, ¶ 5, 301 Mont. 28, ¶ 5, 7 P.3d 358, ¶ 5.

¶24   A criminal defendant may not be found guilty of an offense based on the testimony of another person responsible or legally accountable for the same offense unless the other person's testimony is corroborated by other evidence which, in itself and without the aid of the other person's testimony, tends to connect the defendant with the commission of the offense. Section 46-16-213, MCA. Corroborating evidence need not extend to every fact to which the accomplice testifies. *State v. Ungaretti* (1989), 239 Mont. 314, 318, 779 P.2d 923, 925. We have elaborated the test for sufficiency of evidence as follows:

> To be sufficient, corroborating evidence must show more than that a crime was in fact committed or the circumstances of its commission. It must raise more than a suspicion of the defendant's involvement in, or opportunity to commit, the crime charged. But corroborative evidence need not be sufficient, by

itself, to support a defendant's conviction or even to make out a prima facie case against him. Corroborating evidence may be *circumstantial* and can come from the defendant or his witnesses. [Emphasis added.]

*State v. Kemp* (1979), 182 Mont. 383, 387, 597 P.2d 96, 99. Corroborating evidence is not insufficient just because it is circumstantial, disputed or even possibly consistent with innocent conduct; it is up to the jury to resolve such factual questions. *State v. Kaczmarek* (1990), 243 Mont. 456, 460, 795 P.2d 439, 441 (citation omitted).

¶25 We conclude the District Court correctly determined the accomplice testimony was corroborated by sufficient independent circumstantial evidence submitted to the jury. Setting aside the testimony of Staley entirely, the jury in the present case heard eye-witness testimony Burkhart pursued two men towards the place where, and the time when, Ledeau was walking home. The jury also heard Burkhart was extremely angry, exclaiming, "I am going to kill the fucker that broke into [my] car." Smith-Sterner testified Burkhart confronted someone resembling Ledeau in the alley. Jurors also heard evidence that an altercation probably ensued in the alley. Burkhart subsequently told police he chased after someone resembling Ledeau. Police found Ledeau's body several feet away from the initial confrontation spot with at least four severe blows to the head. In particular, two skull wounds that produced a depression were matched with the ball-peen hammer found in proximity to Ledeau's body. Further, the shape and the size of the fractures in Ledeau's skull were a signature of the instrument and account for the multiple fractures. The District Court correctly concluded Staley's accomplice testimony was corroborated by sufficient independent evidence submitted to the jury.

¶26    Accordingly, we affirm the District Court's conclusion.

## ISSUE TWO

¶27    **Whether the District Court correctly denied Burkhart's motion to dismiss and deprived him of due process on the grounds the predicate offense for felony-murder was an assault with a weapon?**

¶28    First, Burkhart argues the State abridged his due process rights because the predicate offense underlying his felony-murder charge was not independent of the homicide. Burkhart's contention is the principle of merger prevents charging him with felony-murder when the predicate offense, felonious assault with a weapon, is an integral part of the homicide. In other words, Burkhart asserts where the only felony committed was the assault upon the victim which resulted in the victim's death, the assault should merge with the killing and cannot be relied upon by the State as an ingredient of a felony-murder. Burkhart also argues the charge of felony-murder under the facts of this case precludes him from raising certain defenses and lesser included offenses available under the deliberate homicide statute and thereby denies him due process of law. *See* § 45-5-103(2), MCA, and § 45-5-104(2), MCA. Thus, Burkhart maintains the felony-murder rule punishes all homicides, committed in the course of proscribed felonies whether intentional, unintentional or accidental, without the necessity of proving the relation between the homicide and the perpetrator's state of mind.

¶29    The State counters the felony-murder statute found in § 45-5-102(1)(b), MCA, as written and intended by the Montana Legislature, does not require merger. The State also

12

maintains Burkhart was properly convicted under the felony-murder statute because he knowingly and purposely caused bodily injury to Ledeau with a hammer which resulted in Ledeau's death.

¶30    Second, Burkhart asserts his due process rights were abridged because the State was relieved from having to prove a specific mental state for homicide.   Burkhart maintains the felony-murder charge eliminates the State's burden of proving he purposely or knowingly caused the death of Ledeau.   Thus, Burkhart argues the felony-murder charge allows the State to "bootstrap" a homicide charge on the basis of a felonious assault, circumventing the mental state requirements of the deliberate homicide statute.

¶31    The State counters Burkhart's conduct created a dangerous circumstance and thus, the mental state to commit the felony was properly supplied for all consequences, including the homicide. The State asserts there is little difference between proving Burkhart purposely and knowingly struck Ledeau with a ball-peen hammer, thus causing his injury and consequently death, and proving he purposely or knowingly caused Ledeau's death.

¶32    The grant or denial of a motion to dismiss in a criminal case is a question of law which is reviewed *de novo*.  *State v. Adgerson*, 2003 MT 284, ¶ 24, 318 Mont. 22, ¶ 24, 78 P.3d 850, ¶ 24.  This Court's standard of review is plenary, and we determine whether a district court's conclusion is correct.  *State v. Beanblossom*, 2002 MT 351, ¶ 9, 313 Mont. 394, ¶ 9, 61 P.3d 165, ¶ 9.

¶33    The felony-murder doctrine comes to us through the common law making one who causes another's death during a felony responsible for murder.  The first formal statement

of the doctrine is often said to be in *Mansell & Herbert's Case*. (*See* Note, *Felony Murder as a First Degree Offense: An Anachronism Retained*, 66 Yale L.J. 427, 428 n.15 (1957)). Herbert and a group of more than forty followers had gone to Sir Richard Mansfield's house under pretense of lawful authority to seize goods by force. One of Herbert's servants threw a stone at a person in the gateway which instead hit and killed an unarmed woman coming out of Mansfield's house. The question at trial was whether the accused was guilty of murder or manslaughter. The court assumed that the throwing of the stone was not a careless act but rather the servant who threw the stone intended at least to hit, if not kill, some person on Mansfield's side. The court thus held that if one deliberately performed an act of violence to third parties, and a person not intended dies, it was murder regardless of any mistake or misapplication. *Mansell & Herbert's Case*, 2 Dyer 128b; 73 Eng.Rep. 279 (KB, 1558).

¶34    After its early enunciation, the felony-murder doctrine went unchallenged because at that time practically all felonies were punishable by death. Note, *Felony Murder as a First Degree Offense: An Anachronism Retained*, 66 Yale L.J. 427, 428 n.15 (1957). It was, therefore, of no particular consequence whether the condemned was hanged for the initial felony or for the death accidentally resulting from the felony. Case law of the nineteenth century, however, reflects the efforts of the English courts to limit the doctrine by requiring the underlying felony involve violence or be the "natural and probable consequence of the defendant's conduct . . . ." 2 Wayne R. LaFave, *Substantive Criminal Law*, § 14.5 at 446-47 (2d ed. 2003). In the twentieth century, the felony-murder doctrine was rarely invoked in

14

England and in 1957, abolished. Opponents of the doctrine pointed out that in later years, numerous offenses which were once regarded as gross misdemeanors or misdemeanors had been made felonies by statutory enactment, many of which were *malum prohibitum* rather than *malum in se*. These changes, it was argued, made the felony-murder rule too harsh. Prevezer, *The English Homicide Act: A New Attempt to Revise the Law of Murder*, 57 Colum.L.Rev. 624, 635 (1957).

¶35    While some states have recently abolished the felony-murder doctrine as passed down through the common law (*see* Hawaii Rev.Stat., § 707-701), others have expressly limited its provisions. In particular, some jurisdictions limit the underlying felony and its manner of commission to a high risk of causing death (*see e.g. Commonwealth v. Bowden* (Penn. 1973), 309 A.2d 714) while others require the defendant's conduct be the proximate or legal cause of the victim's death (*see e.g. State v. Mauldin* (Kan. 1974), 529 P.2d 124). Still others have circumscribed its application by requiring the underlying felony be independent of the homicide. (*See e.g. People v. Ireland* (Cal. 1969), 450 P.2d 580). Burkhart urges this Court to adopt the latter. We decline.

¶36    Montana's felony-murder statute provides that a person who causes the death of another *during the course of an enumerated felony* is criminally responsible for the death:

> (1) A person commits the offense of deliberate homicide if: . . . ,
> . . . .
> (b) the person attempts to commit, commits, or is legally accountable for the attempt or commission of . . . assault with a weapon . . . or any other forcible felony and in the course of the forcible felony or flight thereafter, the person or any person legally accountable for the crime causes the death of another human being.

15

Section 45-5-102(1)(a)-(b), MCA. This Court has held the purpose of the felony-murder rule is to ensure that people who engage in dangerous acts likely to result in death are held responsible for any resulting deaths, whether or not the acts were planned or premeditated. *State v. Nichols* (1987), 225 Mont. 438, 449, 734 P.2d 170, 176. The felony-murder rule creates an alternate means of holding one responsible for reckless actions likely to result in death. Thus, the only causal connection required "is that the death actually occurred during the underlying felony or the flight thereafter." *State v. Cox* (1994), 266 Mont. 110, 119, 879 P.2d 662, 668.

¶37     When interpreting statutes, the role of this Court "is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. Where the language is clear and unambiguous, no further interpretation is required. *State v. Montana Thirteenth Judicial District Court*, 1998 MT 34, ¶ 15, 288 Mont. 27, ¶ 15, 955 P.2d 639, ¶ 15. However, as Burkhart's attorney attempted to make clear at oral argument, the question confronting this Court is not whether the statute is unconstitutional on its face. Instead, Burkhart asks this Court to consider whether the statute, as applied to the facts of this case, unnecessarily deprives a defendant of the due process of law when he is convicted of felony-murder and the underlying felony is integral to the homicide.

¶38     The facts of this case disclose Burkhart struck Ledeau once, chased after him, and stuck him several more times, causing his death. Montana's felony-murder statute specifically contemplates the facts at hand when, "*in the course* of the forcible felony, any

16

person legally accountable for the crime causes the death of another human being." Section § 45-5-102, MCA. Montana's statute does not require the death to be "in furtherance" of the threshold crime, only that the homicide occur in the course of the enumerated forcible felony. Further, we have held the only causal connection required "is that the death actually occurred during the underlying felony or the flight thereafter." *Cox*, 266 Mont. at 119, 879 P.2d at 668. Evidence at trial indicates Burkhart encountered Ledeau in the alley and physically confronted him. Burkhart then chased after Ledeau where he was eventually found dead. We conclude that Burkhart's underlying offense was assault with a weapon, a forcible felony, and an offense encompassed under Montana's felony-murder statute. Under the circumstances Burkhart's due process rights were not abridged.

¶39    Burkhart next maintains the felony-murder rule punishes all homicides, committed in the course of proscribed felonies whether intentional, unintentional or accidental, without the necessity of proving the relation between the homicide and the perpetrator's state of mind. Burkhart argues the charge of felony-murder under the facts of this case precludes him from raising certain defenses and lesser included offenses available under the deliberate homicide statute and thereby denies him due process of law. This Court has held, "[A] trial court need not give an instruction on a lesser-included offense when there is no evidence to support it. A lesser-included offense instruction is not supported by evidence when the defendant's evidence or theory, if believed, would require an acquittal." *State v. German*, 2001 MT 156, ¶ 11, 306 Mont. 92, ¶ 11, 30 P.3d 360, ¶ 11. The District Court in *German*, for example, refused the defendant an instruction on the lesser-included offense of negligent

17

homicide because he consciously shot the victim. *German*, ¶ 14. Evidence presented at trial here indicates Burkhart was angry about his car and exclaimed, "I am going to kill the fucker that broke into [my] car." An instruction for mitigated deliberate homicide would have required evidence of extreme mental or emotional distress for which could be reasonably explained or excused. *State v. Brown*, 2003 MT 166, ¶ 20, 316 Mont. 310, ¶ 20, 71 P.3d 1215, ¶ 20. No evidence of this nature was presented or any other evidence to justify a lesser-included offense of deliberate homicide. Although Burkhart gave notice of possible defenses of mistaken identity and justifiable use of force, there was no evidence to warrant such instructions be read to the jury. In the absence of such evidence, there is no due process right to a lesser-included offense instruction. *German*, ¶ 11.

¶40    Burkhart also asserts his due process rights were abridged because the State was relieved from having to prove a specific mental state for homicide. Burkhart maintains the charge for felony-murder, with no predicate offense but the assault with a weapon, eliminates the state's burden of proving he purposely or knowingly caused Ledeau's death. Burkhart argues all homicide charges require a showing of the necessary mental state whether deliberate, mitigated or negligent while felony-murder only requires a showing of intent to do the underlying felony.

¶41    Under the felony-murder rule, Burkhart's purpose and knowledge to commit felony-murder was presumed when he assaulted Ledeau with a hammer, causing Ledeau's death. This Court has held "[w]hen a defendant commits a felony such as burglary, kidnapping or aggravated assault, he initiates conduct which creates a dangerous circumstance. Therefore

18

the intent to commit the felony supplies the intent for all the consequences, including homicide, arising therefrom." *State v. Nichols* (1987), 225 Mont. 438, 449, 734 P.2d 170, 176.

¶42 In enacting the felony-murder rule, the Legislature found the homicidal risk is greater when there is a commission of a felony and that the protection of the person from this increased risk warranted greater penalties. The Criminal Law Commission Comment, on which the Legislature relied in enacting § 94-5-102 R.C.M. 1947, now § 45-5-102, MCA, stated:

> Section 45-5-102, MCA, relates only to conduct which is done deliberately; that is, purposely or knowingly. The enumerated offenses in subsection (b) broaden the old law dealing with felony-murders . . . to include any felony which involves force or violence against an individual. Since such offenses are usually coincident with an extremely high homicidal risk, a homicide which occurs during their commission can be considered deliberate homicide.

Clearly, the Legislature properly allowed and broadened the law relating to the felony-murder rule. Indeed, it appears the Legislature specifically enumerated specific felonies which are to be included within the felony-murder category. Quoting from a treatise on the subject, this Court has noted, "It is not the purpose of the felony-murder rule to foist authorship of a homicide upon a felon; the purpose is merely to clothe the felon's act of killing with malice." *State v. Weinberger* (1983), 206 Mont. 110, 115, 671 P.2d 567, 569 (quoting 2 Wharton's Criminal Law (14th ed.) 221, § 149). Thus, in construing the felony-murder statute, it is the mental state which is imputed to the felon for an assault incidental to the homicide, not the act of killing.

¶43 The dissent frames this Court's argument in the context of the Supreme Court's

decision in *Sandstrom v. Montana* (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39, which held if a state defines an element of a crime that must be proved by the prosecution, that burden cannot be shortcut by use of an evidentiary presumption. The dissent maintains the felony-murder rule creates a conclusive presumption of the defendant's murderous intent from his intent to commit the underlying felony and thereby retains intent as an element of the offense of felony murder. Diss. Op., ¶ 74. We have maintained however, the state does not bear the burden to prove an intent to kill, stating, "[i]ntent as such is not an element under the felony murder rule." *Sunday*, 187 Mont. at 307, 609 P.2d 1197. Thus, *Sandstrom* is inapposite: we are not considering a conclusive presumption of *mens rea*. A jury has not been instructed to presume an element of the crime from some other facts, nor has the state been relieved of its burden to prove a statutory element. Rather, "the state may substitute proof of the mental state necessary to commit a homicide with proof of the mental state required to commit the underlying felony." *Nichols*, 225 Mont. at 450, 734 P.2d at 177.

¶44     Further, even if the current statute is viewed as creating a presumption, the presumption at issue here is not analogous to that derided in *Sandstrom*. The quote from our holding in *Nichols,* which the dissent uses to validate its contention the felony-murder rule creates and retains a conclusive presumption of the defendant's murderous intent, actually strengthens our holding here. If the felony-murder rule creates a presumption, it does not operate to shift a burden from the state to the defendant, but rather "substitute[s] proof of the mental state necessary to commit a homicide with proof of the mental state required to commit the underlying felony." *Nichols*, 225 Mont. at 450, 734 P.2d at 177. The Legislature

20

has determined a killing committed during a felony is deliberate homicide, felony-murder, and we are not convinced the statute, were it to be challenged facially, *may be* unconstitutional simply because it creates criminal liability for deliberate homicide when the state has not shown the accused had the intent to kill. *See also State v. Reeves* (Neb. 1990), 453 N.W.2d 359 (felony murder requires only the intent to commit the underlying felony; once that intent is proved, it is imputed to the killing, and *Sandstrom* is inapplicable), *vacated on other grounds*, 498 U.S. 964, 111 S.Ct. 425, 112 L.Ed.2d 409 (1990); *People v. Benson* (NY 1984), 480 N.Y.S.2d 811 (intent is not an element of the crime of felony murder, and *Sandstrom* not implicated); *Commonwealth v. Rawls* (Penn. 1984), 477 A.2d 540 (equating of intent to kill with intent to commit a serious felony is permissible legislative decision reflecting the gravity of killing during a serious felony); *State v. Sheffield* (Tenn. 1984), 676 S.W.2d 542 (statute makes killing during a felony first degree murder and does not have the effect of shifting burden of proof to defendant). Thus, because the felony-murder rule does not in fact raise a presumption of the existence of an element of the crime, it does not violate the due process clause.

¶45    The dissent also seeks to "work the sort of violence" upon Montana's felony-murder statute so as to include in it a *mens rea* element. Diss. Op., ¶ 11. In so doing, the dissent relies on *Morissette v. United States* (1952), 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288, and *United States v. United States Gypsum* (1978), 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854, for the proposition that a culpable mental element provides a rationale for punishment. Diss. Op., ¶ 7. However, unlike the crimes of conversion or price fixing, which *Morissette* and

21

*United States Gypsum* dealt with respectively, felony-murder does contain an element of intent, albeit not the intent to kill. The perpetrator must intend to engage in dangerous acts likely to result in death and is thus held responsible for any resulting deaths, whether or not the acts were planned or premeditated. *Nichols*, 225 Mont. at 449, 734 P.2d at 176. Further, the state must carry its burden to prove that felony. As stated above, the Legislature properly allowed and broadened the law relating to the felony-murder rule. Indeed, it appears the Legislature expressly enumerated specific felonies which are to be included within the felony-murder category. The Legislature has decided that an individual who attempts to commit a felony and who takes a life during the commission of that felony has committed deliberate homicide, felony-murder. The statute provides notice to such an individual that, should he or she choose to participate in a serious felony, and should someone be killed, the felon will be subject to criminal liability for deliberate homicide. We do not believe this is constitutionally infirm.

¶46    Therefore, we affirm the District Court's dismissal.

## ISSUE THREE

¶47    **Whether the District Court abused its discretion when it removed a prospective juror for cause?**

¶48    Burkhart argues the State had a tactical advantage when the District Court erroneously removed a prospective juror for cause. Burkhart maintains the District Court's removal of the prospective juror effectively gave the State an additional peremptory challenge and requires reversal.

¶49   The State counters the juror was properly removed for cause when he indicated a reluctance to follow laws he found disagreeable and therefore no reversible error occurred. The State asserts the prospective juror showed an unwillingness to follow seat belt, gun and forfeiture laws were he to be impaneled, evidencing grounds for disqualification.

¶50   This Court reviews the denial of a challenge to dismiss a juror for cause for abuse of discretion. *State v. Freshment*, 2002 MT 61, ¶ 11, 309 Mont. 154, ¶ 11, 43 P.3d 968, ¶ 11. We will not reverse a district court's decision regarding a juror's fitness to serve absent an abuse of discretion. *State v. Good*, 2002 MT 59, ¶ 40, 309 Mont. 113, ¶ 40, 43 P.3d 948, ¶ 40.

¶51   The bases for challenging potential jurors for cause in Montana are set forth in § 46-16-115(2)(j), MCA. One specified basis is that a juror has a "state of mind in reference to the case or to either of the parties that would prevent the juror from acting with entire impartiality and without substantial prejudice to the substantial rights of either party." Section 46-16-115(2)(j), MCA. If *voir dire* examination raises a serious question about a prospective juror's ability to be fair and impartial, dismissal for cause is favored. *Freshment*, ¶ 11.

¶52   In *Freshment*, we held the District Court abused its discretion when it failed to dismiss two jurors for cause due to their consistent and direct statements of bias against the defendant's legal defense of a reasonable belief the victim was old enough to consent. Further, we determined a juror's retraction of clearly stated bias, whether coaxed by the court, the prosecution or the defense, could not erase actual prejudice against the substantial

23

rights of the party. *Freshment*, ¶ 18.

¶53 Based on the *voir dire* of O'Leary, we hold the District Court did not abuse its discretion in dismissing the juror for cause. Although O'Leary did not state a bias towards the exact nature of Burkhart's defense like *Freshment*, he stated a bias related to an issue critical to the outcome of the case: whether he could follow the law as given in light of the evidence. Although he later qualified his bias when pressed by Burkhart's attorney, O'Leary stated he "might have a problem" with being asked to evaluate the facts when he disagreed with the law. As we stated in *Freshment*, however, "[c]oaxed recantations in which jurors state they will merely follow the law, whether prompted by the trial court, the prosecution, or the defense, do not cure or erase a clearly stated bias which demonstrates actual prejudice against the substantial rights of a party." *Freshment*, ¶ 18. Further, O'Leary showed a more general bias when he recited a series of laws that he found disagreeable. Specifically, O'Leary said that he would not necessarily follow the law given him by the court, regardless of the subject matter of the particular instruction.

¶54 "Because of the right to an impartial jury, and the great expense and inconvenience that results from retrial, dismissal for cause is favored when a serious question arises about the juror's ability to be impartial." *Freshment*, ¶ 11. Thus, we hold the District Court did not abuse its discretion in dismissing the juror for cause.

**ISSUE FOUR**

¶55 **Whether the District Court improperly considered Burkhart's refusal to admit guilt or express remorse at his sentencing hearing?**

24

¶56 Burkhart maintains the District Court violated his constitutional right to remain silent when it ordered him to answer questions regarding his involvement in the homicide as well as any remorse harbored for his actions. Burkhart asserts the District Court violated *State v. Shreves*, 2002 MT 333, 313 Mont. 252, 60 P.3d 991, and based its sentencing on his refusal to admit guilt or show remorse.

¶57 The State responds the District Court's sentencing was properly based on recommendations by the prosecution and Burkhart's probation officer, Burkhart's criminal history and the brutality of the offense as well as the lack of remorse. The State maintains the record is devoid of any suggestion the District Court would have handed down a different sentence had Burkhart shown remorse.

¶58 We review the imposition of a sentence solely for legality, determining whether the sentence is within the statutory parameters. *State v. McLeod*, 2002 MT 348, ¶ 12, 313 Mont. 358, ¶ 12, 61 P.3d 126, ¶ 12. "[A] sentencing court may consider any evidence relevant to a defendant's sentence, including evidence relating to the crime," the defendant's background, his character, his mental and physical condition and any other evidence the court views as having probative value. *Shreves*, ¶ 13.

¶59 In *Shreves*, we determined the court considered the defendant's lack of remorse as a general factor in deciding the entire sentence. *Shreves*, ¶ 13. Shreves testified at trial but invoked his right to remain silent at his sentencing hearing. Although Shreves maintained his innocence throughout the trial, the court sentenced him based in part on the fact Shreves showed no remorse, no accountability, and did not explain why the crime occurred. We

determined the court "based its sentence in large part on Shreves' lack of remorse and [the court] analogized that lack of remorse to Shreves' silence." *Shreves*, ¶ 20. We also noted "[t]he court then based its sentence on Shreves' failure to 'give' the court something about why the crime happened." *Shreves*, ¶ 20. We concluded that while "lack of remorse can be considered as a factor in sentencing [and its effects on a defendant's prospective rehabilitation], we cannot uphold a sentence that is based on a refusal to admit guilt." *Shreves*, ¶ 20. We also held, however, a "court can consider as a sentencing factor a defendant's lack of remorse as evidence by any admissible statement made by the defendant pre-trial, at trial, or post-trial . . . or gleaned, without more, from the manner of the commission of the offense as demonstrated by the evidence at trial or from other competent evidence properly admitted at the sentencing hearing." *Shreves*, ¶ 21.

¶60 The record does not reflect that the court considered Burkhart's silence at the sentencing hearing as lack of remorse. The record similarly does not reflect Burkhart's sentence was in large part based upon the fact he refused to take responsibility and admit his crime. *Shreves*, ¶ 13. Instead, the record in this case reflects the District Court's careful consideration of many relevant factors in sentencing Burkhart. These factors include recommendations by the prosecution and Burkhart's probation officer, Burkhart's criminal history, the brutality of the offense and Burkhart's lack of remorse. The District Court concluded:

> Now the reason for this sentence is the brutality of the offense. The court is shocked by the way this young man died. In addition to that, this is the defendant's third felony conviction. In addition to that, this offense was committed while the defendant was on probation. In addition to that, this

26

offense was in violation of the conditions of that probation, in that he had left his assigned area without permission, and that while in Great Falls, that he was attempting and possibly did buy methamphetamine . . . . Furthermore, the court finds the defendant completely and totally without remorse. The court does not have a shred of hope of rehabilitation of this young man . . . . In addition . . . I'm following the recommendation of the State of Montana through the county attorney's office and through the recommendation of Adult Probation and Parole.

¶61 The record thus indicates the District Court did not violate our pronouncement in *Shreves* when it considered Burkhart's lack of remorse in the context of his ability to be rehabilitated, finding the former and not the latter. *Shreves*, ¶ 20. Although Burkhart maintains the court bombarded him with questions regarding his convictions, chastised him for maintaining his innocence, and condemned him for failing to show remorse for the homicide, the record at sentencing instead shows the District Court's consideration of, "the defendant's background, his character, his mental and physical condition and any other evidence the court views as having probative value." *Shreves*, ¶ 13.

¶62 We conclude the District Court did not sentence Burkhart more harshly because he failed to admit he committed the charged offense. Accordingly, we affirm the sentence of the District Court.

¶63    The judgment of the District Court is affirmed.


/S/ JIM REGNIER


We Concur:

/S/ KARLA M. GRAY
/S/ PATRICIA O. COTTER
/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ JIM RICE

Justice Patricia O. Cotter concurs.

¶64    I concur in much that is said in Justice Leaphart's Dissent.  I too am uneasy with the fact that application of the felony-murder doctrine can impermissibly raise a conclusive presumption of intent to murder from an act which, standing alone, could not supply such a motive.  However, as the Court points out, we are faced in this case with an "as applied" challenge of the doctrine, so we must examine whether application of the doctrine has constitutional implications for Burkhart given the particulars of his crime.  Because I conclude it does not, I am voting to affirm.

¶65    The ferocity of Burkhart's assaults on Ledeau that led to his death did, in my judgment, supply the intent for murder.  This being so, we are not confronted with the situation where a presumption of guilt is imposed upon a set of facts which do not otherwise raise or establish a murderous intent.  When and if such a case presents itself to this Court, an "as applied" challenge will likely resonate well with me.  However, this is not such a case. I would therefore affirm.

/S/ PATRICIA O. COTTER

Justice James C. Nelson joins in the concurrence of Justice Patricia O. Cotter.

/S/ JAMES C. NELSON

Justice W. William Leaphart dissenting.

¶66 Because I believe that the felony-murder statute under which the Appellant was charged is fundamentally defective under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, I dissent.

¶67 Although the Court recites the history of the felony-murder rule,[1] with special reference to the various limitations which courts have imposed upon it in an effort to mitigate some of the more illogical and legally troubling results of its application,[2] the opinion does not, to my mind, properly confront the rationale behind the limitation which the Appellant cites. The merger doctrine precludes assaultive offenses from providing the basis for a charge of felony murder, when the victim of the assault is also the victim of the homicide–that is, when the assault is an ingredient of the homicide, or is included within it in fact, even (in the doctrine's most robust form) if not in law. *See* Robert L. Simpson, *Application of the Felony-Murder Doctrine Where the Felony Relied Upon is an Includible Offense with the Homicide*, 40 A.L.R.4th 1341 (1971). In doing so, the doctrine seeks to prevent the worst results of the felony-murder rule's having dispensed with a *mens rea* element for the murder charge. As the Illinois Court of Appeals has explained, "Unless application of the felony-murder rule is limited to cases in which a killing occurs during the commission of a felony consisting of conduct other than that inherent in the killing itself, all deliberate killings and all fatal shootings may be charged as felony murder." *People v.*

---

[1] *See also People v. Aaron* (Mich. 1980), 299 N.W.2d 304; Wayne R. LaFave, *Substantive Criminal Law* § 14.5(a) (2nd ed. 2003).

[2] Maj. op., ¶ 35.

30

*Morgan* (Ill.App. 1999), 718 N.E.2d 206, 211. All homicides could be charged as felony murders, because all homicides, by definition, include an initial assault upon the victim. Thus, "the felony that eliminates the quality of the intent must be one that is independent of the homicide and of the assault merged therein . . . ." *People v. Moran* (N.Y. 1927), 158 N.E. 35, 36 (Cardozo, C.J.). *See also Ragland v. Hundley* (8th Cir. 1996), 79 F.3d 702, 705 n.4 (merger doctrine intended "to avoid the prosecution's bootstrapping a simple homicide to a higher degree of murder without showing the requisite intent").

¶68　The statute which embodies Montana's version of the felony-murder rule specifies both simple and aggravated assault as underlying offenses to felony murder. Section 45-5-102(1)(b), MCA. It is thus not subject to a construction that would incorporate the merger doctrine, for where the language of the statute is clear and unambiguous, the statute speaks for itself and we will not resort to other means of interpretation. Moreover, this Court is required to simply ascertain and declare what is in terms or in substance found in the statute, neither inserting what has been omitted, nor omitting what has been inserted. *Hilands Golf Club v. Ashmore,* 2002 MT 8, ¶ 20, 308 Mont. 111, ¶ 20, 39 P.3d 697, ¶ 20. Nonetheless, the merger doctrine's focus upon *mens rea* provides the key to why our felony-murder statute violates the Due Process Clause.

¶69　Section 45-5-102(1), MCA, does not facially require a *mens rea* element in order to charge murder based on the homicide. The statute reads, in pertinent part:

> A person commits the offense of deliberate homicide if: (a) the person purposely or knowingly causes the death of another human being; or (b) the person attempts to commit, commits, or is legally accountable for the attempt or commission of robbery . . . or any other forcible felony and in the course of

31

the forcible felony or flight thereafter, the person or any person legally accountable for the crime causes the death of another human being.

¶70    This Court has interpreted § 45-5-102(1), MCA, accordingly. In *State v. Sunday* (1980), 187 Mont. 292, 307, 609 P.2d 1188, 1197, we stated that "[i]ntent as such is not an element under the felony-murder rule. . . . Intent was no longer an issue under the felony-murder statute once it was shown by the evidence that" the defendant committed the underlying felony. In *State v. Nichols* (1987), 225 Mont. 438, 449-50, 734 P.2d 170, 177, this substantive rule of law was presented as a rule of evidence: "Under the felony-homicide statute, the state has not been relieved of the burden of proving an element of a crime. Rather, the method of proving one of the elements has been changed. The state may substitute proof of the mental state necessary to commit a homicide with proof of the mental state required to commit the underlying felony." *See also Sandstrom v. Montana* (1979), 442 U.S. 510, 517, 99 S.Ct. 2450, 2456, 61 L.Ed.2d 39, 46-47; *People v. Dillon* (Cal. 1983), 668 P.2d 697, 717-18.

¶71    Section 45-5-102(1), MCA, thus defines a distinct offense with its own unique set of elements: an underlying felony and a death deriving from it, with no intent required for the homicide to be charged to the defendant as a murder. *See* Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law* § 7.5 at 622 n.2 (arguing that felony murder is a category separate from intent-to-kill murder). The homicide is the elevating factor for the purposes of both stigma and sanction, the *discrimen* between the underlying felony and felony murder. For example, the maximum punishment for simple assault under § 45-5-201(2), MCA, is a five-hundred-dollar fine and six months of incarceration in the county jail; aggravated assault is

punished under § 45-5-202(2), MCA, by at most a fine of fifty thousand dollars and twenty years' imprisonment. When either felony is coupled with a death under § 45-5-102(1), MCA, however, the maximum potential penalty is increased to life imprisonment, and the convict is termed a murderer, without the intent element for murder having been proven by the State.

¶72 This plainly violates the Due Process Clause of the Fourteenth Amendment, as that provision has been interpreted by the United States Supreme Court in *Morissette v. United States* (1952), 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288, and *United States v. United States Gypsum Co.* (1978), 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854. In *Morissette*, the Court required that a statute which criminalized the theft of federal property be read to include the *mens rea* element of intent. In a famous passage, Justice Jackson wrote:

> The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. A relation between some mental element and punishment for a harmful act is almost as instinctive as the child's familiar exculpatory "But I didn't mean to," and has afforded the rational basis for a tardy and unfinished substitution of deterrence and reformation in place of retaliation and vengeance as the motivation for public prosecution.

*Morissette*, 342 U.S. at 250-51, 72 S.Ct. at 243, 96 L.Ed. at 293-94.

¶73 In *United States Gypsum*, furthermore, the Court held that intent is a necessary element in a prosecution for a non-regulatory offense. *United States Gypsum*, 438 U.S. at 436-38, 98 S.Ct. at 2873-74, 57 L.Ed.2d at 869-70.

¶74 Alternatively, certain language in the Court's opinion, and in *Nichols*, seems to frame the felony-murder rule as a conclusive presumption of the defendant's murderous intent from his intent to commit the underlying felony, retaining intent as an element of the offense of felony murder. The Court writes: "Under the felony-murder rule, Burkhart's purpose and knowledge to commit felony murder was presumed when he assaulted Ledeau with a hammer, causing LeDeau's death." Maj. op., ¶ 41. The Court goes on to quote *Nichols* for the proposition that intent to commit the underlying felony somehow "supplies the intent" for murder. Maj. op., ¶ 41 (citing *Nichols,* 225 Mont. at 449, 734 P.2d at 176). If we are to take these statements at face value, the felony-murder doctrine is unconstitutional under *Sandstrom*, in which the United States Supreme Court held that a conclusive presumption of guilt as to any element of an offense violates the Due Process guarantee.

> [T]he trial court may not withdraw or prejudge the issue by instruction that the law raises a presumption of intent from an act. . . . A conclusive presumption which testimony could not overthrow would effectively eliminate intent as an ingredient of the offense. . . . A presumption which would permit the jury to make an assumption which all the evidence considered together does not logically establish would give to a proven fact an artificial and fictional effect. In either case, this presumption would conflict with the overriding presumption of innocence with which the law endows the accused and which extends to every element of the crime.

*Sandstrom*, 442 U.S. at 522, 99 S.Ct. at 2458, 61 L.Ed.2d at 49-50 (quoting the holding of *Morissette*, 342 U.S. at 274-75, 72 S.Ct. at 255-56, 96 L.Ed. at 306-07); *see also Dillon*, 668 P.2d at 716-17 ("[w]e start with the indisputable fact that if the effect of the felony-murder rule on malice is indeed a 'presumption,' it is a 'conclusive' one"); *State v. Ortega* (N.M.

34

1991), 817 P.2d 1196, 1204 (by interpreting felony-murder rule to presume murderous intent from intent to commit underlying felony, "one runs headlong into *Sandstrom*").

¶75    When this Court reviews the constitutionality of a legislative enactment, we will presume the statute to be constitutional and will uphold the statute on review except when it is proven to be unconstitutional beyond a reasonable doubt. *State v. Folda* (1994), 267 Mont. 523, 525-26, 885 P.2d 426, 427. We will, moreover, seek to construe the statute in such a way as to find it constitutional, if possible. *State v. Martel* (1995), 273 Mont. 143, 148, 902 P.2d 14, 17. In the present context, it seems clear to me that the only way in which to save § 45-5-102(1), MCA, is to construe it to include a *mens rea* element. This was the approach taken by the New Mexico Supreme Court in *Ortega*. *See also Robbins v. State* (1854), 8 Ohio St. 131 (held, that in a statute providing that if any person shall "purposely, and of deliberate and premeditated malice, or in the perpetration, or attempt to perpetrate, any rape, arson, robbery, or burglary . . . kill another" such person should be deemed guilty of murder in the first degree, the word "purposely" modified each of the following clauses).

¶76    Unfortunately, I believe that the statute forecloses such an approach. The Ohio statute which that state's Supreme Court subjected to interpretation was of far looser and more ambiguous structure than is our own. Section 45-5-102(1), MCA, by contrast, unambiguously provides that a defendant may be found guilty of murder upon proof only of his having committed a felony and having caused a death thereby. Section 45-5-102(1)(a), MCA ("the person purposely or knowingly causes the death of another human being; *or . . .*" (emphasis added)). Out of deference to our coequal branch of government, therefore, I will

35

not attempt to work the sort of violence upon the statute at issue that the necessary interpretation would require.

¶77    The felony-murder rule is based on the ancient idea that the defendant is an evil person who has committed a bad act, and therefore should be held maximally responsible for all the consequences that flow therefrom, whether he intended them in any sense, or not. *See* Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law* 560 (1972). The law once deemed this an adequate arrangement, that a defendant could be punished criminally for results which he may have in no wise intended, and this indifference to the actual culpability of the individual is amply evidenced in the felony-murder rule's failure to prescribe a *mens rea* element for a finding of murder-guilt. The law, however, has long since progressed beyond this point, a development reflected in the Due Process jurisprudence of the Supreme Court of the United States.

¶78    Make no mistake: I have no sympathy whatsoever for the Appellant. His actions, besides being horrific in themselves, clearly caused the death of another human being, and he should be held accountable to the full extent of the law. But a charge of deliberate homicide under § 45-5-102(1)(a), MCA, would have been more appropriate and far less constitutionally troubling. No intensity of personal sentiment, however valid and well-intentioned, can strip this defendant, or any other, of the guarantee of Due Process of law. The remarkable procedure for circumventing the principles of *Sandstrom*, set forth in *Nichols* and subscribed to today by the Court, is nothing more than a parlor trick, unworthy of this honorable Court and of our system of justice. The principles enshrined in the Due Process

Clause call for the repudiation of the felony-murder rule, and an affirmation of the idea of punishment for individual culpability.

/S/ W. WILLIAM LEAPHART